ECKLUND, Appellant v. BARRICK et al., Respondents

(144 N.W.2d 605)

(File No. 10269. Opinion filed August 29, 1966)

**Stephens, Riter, Mayer & Hofer,** Pierre, **Joe H. Neumayr,** Gettysburg, for plaintiff and appellant.

**Martens, Goldsmith, May & Porter,** Pierre, for defendants and respondents.

BIEGELMEIER, Judge.

In this action for damages for personal injuries to a ranch employee by a horse about to be broken, the Memorandum Decision of the trial judge on defendants' motion for judgment notwithstanding the jury verdict states the situation and law applicable thereto which meet the approval of this court on appeal. It is hereafter set out. Some notes as to the evidence and record known to the trial judge, but not in that Decision, are added to further explain it. The trial judge wrote:

> "Plaintiff, an employee of defendant, W. N. Barrick, owner and operator of two ranches in Potter County, South Dakota, brought this action against his employer and against Hugh Mayes, the ranch Foreman, for injuries he sustained on April 11, 1961. A verdict was returned for $17,500.00 in plaintiff's favor. Defendants moved for judgment notwithstanding the verdict[1] or, in the alternative, for a new trial. Plaintiff, a single man,

---

1. This was preceded by defendants' motions for directed verdict at the close of plaintiff's evidence and all the evidence to comply with SDC 1960 Supp. 33.1705; when first made their counsel argued it rather strenuously. At that stage of the trial the judge stated to defendants' counsel further argument was not necessary, "if the jury goes against" defendants he would consider it on a motion for judgment n. o. v.

32 years of age, was employed by Barrick as a ranch hand in the fall of 1960. His duties consisted of general ranch work, including taking care of cows, repairing fences, and haying. He was not hired to break horses. These duties were mostly performed on what is described in the evidence as the 14 Mile Ranch. If he had no further work on the 14 Mile Ranch, he was expected to report at the 5 Mile Ranch to perform such duties as directed by the Foreman, Mr. Mayes.

"Plaintiff reported to defendant Mayes at the 5 Mile Ranch on April 11, 1961, and was instructed by him to help Wardell and Blackwell with the horses. Wardell and Blackwell had been hired for the express purpose of breaking horses. On April 11 there were thirty or forty unbroken horses in a corral on the 5 Mile Ranch. Plaintiff, upon direction from Mr. Mayes, assisted Wardell and Blackwell in placing three or four of these horses in a stall in the barn. A swinging gate at the rear of the stall, which was fastened at one end with a rope, completely enclosed the stall. Plaintiff, standing outside the stall, watched while Wardell and Blackwell placed a hacka-more[2] on one of the horses. When this horse was ready to be removed from the stall, defendant Mayes directed plaintiff to untie the rope. Plaintiff, standing in front of the gate, was in the process of untying the rope, when the horse with the hackamore thrust his head over the top of the gate and, in so doing, struck plaintiff on top of the head.[3]

"Plaintiff was involved in an automobile accident in 1950 and, as a result of this accident, he was hospital-

2. Several large scale photographs of the barn, its stalls and especially the stall and gate involved with similar horses in it are part of the record. These show the wooden gate 4½ feet high, both with and without the rope fastening. The gate is substantially constructed and heavily hinged on one end. One photo shows a horse with a hacka-more; it resembles and serves as a halter and also used in riding in place of a bridle; it is partly of braided rope to give it more strength. A twenty foot rope is tied to it and to a post to slow the horse down as he is turned out of the gate.

3. Plaintiff's testimony was: "I raised my head up and the horse hit me on top of the head". Ron Werdell (Wardell), one of the men helping to break these horses, was a witness for plaintiff. His testimony: "Well you see, these horses, their heads stick over the gate, their neck there, and well, that horse just threw his head right up and came down, that is the way they do". We believe anyone familiar with horses would be mindful of this tendency.

ized for an extended period. In 1951, at the Mayo Clinic in Rochester, Minnesota, he had a tantalum plate inserted in the frontal area of his skull. After the accident on April 11, 1961, plaintiff says this plate was dented; that he had dizzy spells, headaches, and was subject to seizures.

"Plaintiff had done general ranch work from the time he finished the 8th grade in school. He had ridden horses and, on a few occasions, assisted in breaking horses, prior to the time he was employed by Barrick.

"In establishing a prima facie case the burden was on the plaintiff to show actionable fault on the part of the employer. Three elements are necessary to constitute actionable negligence. (1) The existence of a duty or obligation on the part of the defendant to protect plaintiff from injury. (2) Failure of the defendant to perform or discharge that duty. (3) Injury to the plaintiff resulting from such failure. Stoner v. Eggers, 77 S.D. 395, 92 N.W.2d 528; Daniels v. Moser, 76 S.D. 47, 71 N.W.2d 739.

"It is plaintiff's contention that the defendants failed to exercise due care in not warning him of the wild and dangerous character of the horses. Plaintiff, however, was aware of the fact that the horses were wild and unbroken.[4] He was familiar with the barn and the operation of the gate. His only duty was to untie the rope in order to permit the gate to swing open. He was as well qualified as the defendants to observe the probable danger involved in having the horse thrust his head over the gate. Under these circumstances, he cannot complain that he was not warned of such danger. As our court stated in Stoner v. Eggers, supra, 'the purpose of a warning is to supply a party with information which he is presumed not to have.'

---

4. The testimony of plaintiff on this phase was: "Q But when you came down there you had worked around these horses enough before so you knew they were being green broken, isn't that so? A I guess so. Q Now isn't it a fact that you have been around horses enough in your work * * * on ranches, that you would know they are liable to do—make sudden movements, Edwin? * * * A Ya, at times different horses do different things, too." Plaintiff admitted he had helped catch and tie up wild horses on defendant's ranch and knew the horses in the stall were horses that the men were breaking.

"It is the duty of a master to furnish his servants with a reasonably safe place to work, and with reasonably safe tools, appliances and equipment with which to perform the work. Where, however, the master has furnished a suitable place to work and suitable appliances, if the servant is mature and sensible and has had some experience in the work being done, he must look after himself as to all obvious dangers in the details of the work. Further, the master cannot be held liable for failure to furnish a safe place to work if the danger is so obvious and is before the servant's eyes to such extent that he must know by the use of ordinary intelligence, the danger that confronts him, nor can the master be held liable for failure to furnish the servant with safe tools, where the servant has equal knowledge with the master as to the safety thereof, as where the tools furnished are of a simple nature in which defects can be readily observed. Stoner v. Eggers, supra.

"Plaintiff contends that defendants failed to furnish a safe place to work because the gate was low enough to permit the heads of horses within the pen to protrude over the gate. While broadly stated, it is the positive duty of a master to furnish his servant with suitable and safe instrumentalities wherewith, and places wherein, to do his work, the determination of what is safe depends on particular circumstances. A master is not an insurer of the safety of the instrumentality or places for work furnished his servant, but is liable only for negligence or the failure to exercise due, ordinary or reasonable care. (Daniels v. Moser, supra); 56 C.J.S. [Master and Servant § 202] 902. There was no failure to exercise due care unless defendants' conduct exposed plaintiff to unreasonable risk of injury. Our court said in Ford v. Robison [Robinson], 76 S.D. 457, 80 N.W.2d 471, that it is generally held in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is a proximate cause of injury, it must appear that the injury was the natural and probable conse-

quence of the negligence or wrongful act. Unless it can be said that plaintiff's injury should have been foreseen by the defendants, as the natural and probable result of his untying the rope on the gate, then no breach of duty by the defendants has been established. There is no evidence that the manner of fastening or unfastening the gate was improper or unsafe. The pen did not break, the gate did not break or fly open, nor was the rope inadequate or improperly tied. Plaintiff has failed to prove that the place of work and the appliances furnished by defendants were not reasonably suitable, safe and appropriate for the work being done.

"Plaintiff has not shown his injury resulted from negligence, but that it resulted from work which he, with full knowledge of conditions, undertook to perform. Conceding all the evidence of plaintiff to be true, and giving it every inference in his favor, he cannot recover, because he has not shown his injury resulted from negligence attributable to the defendants. Bayer v. Chicago B & Q Ry. Co., 53 S.D. 166, 220 N.W. 459.

"Defendants, in their brief, argue that plaintiff is guilty of contributory negligence which is more than slight, and also, that he assumed the risk incident to his employment. They contend either of these defenses is sufficient to bar plaintiff's recovery. Since I have already indicated plaintiff has failed to establish his injuries resulted from negligence attributable to the defendants, a consideration of such defenses is unnecessary.

"Judgment Notwithstanding the Verdict is therefore granted."

The court having properly granted defendants' motion, the judgment appealed from is affirmed.

All the Judges concur.