Theodore A. NIST, Plaintiff,

v.

The Honorable Lorna B. HERSETH,
Secretary of State of the State of
South Dakota, Defendant.

No. 12518.

Supreme Court of South Dakota.

Submitted on Briefs Aug. 17, 1978.

Decided Sept. 13, 1978.

Terence A. O'Keefe and Jeffrey T. Sveen of Siegel, Barnett, Schutz, O'Keefe, Jewett & King, Aberdeen, for plaintiff.

Harry W. Christianson, Asst. Atty. Gen., Pierre, for defendant; William J. Janklow, Atty. Gen., Pierre, on the brief.

WOLLMAN, Chief Justice.

On February 1, 1978, the South Dakota House of Representatives passed House Bill No. 1277, entitled "An Act to Repeal the Guest Statute." The bill passed the Senate without amendment on February 7, 1978, and was signed by the Governor on Febru-ary 23, 1978, and now appears as Ch. 240, Laws of 1978. On March 10, 1978, pursuant to SDCL 2–1–6.1 a blank copy of a referendum petition identifying the above describ-ed Act as the object of a referral effort was filed with the Secretary of State, defendant herein. By May 25, 1978, the petition in 356 sections containing 17,666 signatures had been filed with defendant.

On June 19, 1978, plaintiff made applica-tion to this court for issuance of a writ of prohibition seeking to restrain defendant from certifying the question involved to a vote at the next general election. On June 20, 1978, we appointed a referee to make findings of fact in the matter. The refer-ee's report was filed July 19, 1978. The parties do not dispute the referee's findings.

There were 278,228 votes cast in the 1974 gubernatorial election. The number of sig-natures required on a petition to refer a question to the people in the 1978 general election is, according to SDCL 2–1–3, five percent of the votes cast in the last preced-ing gubernatorial election, or 13,912 signa-tures. As filed, the petition contained 3,754 signatures beyond the statutory minimum.

The issue before us is whether there are sufficient valid signatures to refer Ch. 240, Laws of 1978, to a vote of the people. We are guided in our decision by the principle that the right of the people to be heard on legislative issues of the day should be main-tained and by the legislative directive found in SDCL 2–1–11 that the real intention of the petitioners should not be defeated by mere technicalities.

Plaintiff attacks the entire peti-tion through two general objections. First, he objects that the reference to the subject of the referendum campaign as printed at the top of each petition section is not suffi-cient.[1] We find this objection to be without merit. Second, plaintiff asserts that be-cause some thirty-seven sections of the peti-tion were circulated prior to the filing re-quired by SDCL 2–1–6.1, the entire petition

1. In the space provided for identification of the Act to be referred the following words were inserted: "House Bill No. 1277 ENTITLED, An Act to repeal the guest statute, as approved on February 23, 1978." For statutory require-ments see SDCL 2–1–7.

must fail. We do not agree. Plaintiff cites no authority in support of his request for the application of this harsh penalty. We will not defeat the real intent of the signers on a mere technicality. Defendant concedes, and we accept for the purposes of this case, that the 542 signatures dated prior to the March 10, 1978, filing date may not be counted.

The remaining challenges fall into four categories: (1) Improper circulation; (2) Improper notarization; (3) Improper petition forms; and (4) Defective signatures.

### IMPROPER CIRCULATION

■■ The first challenge under this objection deals with sections of the petition that were not signed by the circulators. A committee in Huron, South Dakota, coordinated the petition drive. Twenty-six sections of the petition containing 896 signatures were returned to the committee without the required notarized verification affidavits. Various members of the committee signed the verification affidavits, and another member notarized these signatures. These affiants did not see any of the alleged petitioners sign. One of them admitted that to her knowledge the names could have been taken from grave stones. Therefore, the verification oaths were knowingly false.

In addressing the matter of fraudulent affidavits we said in *Jensen v. Wells,* 66 S.D. 236, 281 N.W. 99: "It must also appear that there was an intent to deceive. The intent to deceive is the essential element of fraud." 66 S.D. at 243, 281 N.W. at 103. In *Helgerson v. Riiff,* 73 S.D. 467, 44 N.W.2d 126, we expanded upon this rule, saying:

[I]ntent to deceive is not ordinarily susceptible of direct proof and in the absence of evidence to the contrary may be presumed where the falsity was necessarily known to the affiant. The effect of such presumption is to cast upon the party

seeking to sustain the validity of a petition the burden of producing evidence to show that affiant acted in good faith. 73 S.D. at 474, 44 N.W.2d at 129–30.

Defendant makes no attempt to meet this burden and concedes that these 896 signatures may not be counted. We agree. As we said in *O'Brien v. Pyle,* 51 S.D. 385, 393, 214 N.W. 623, 626, "[N]o one is authorized by law to doctor up a sick petition."

■■ The second challenge under this objection concerns sections of the petition that contain signatures that the person who signed as circulator did not personally observe being made, either because more than one person circulated the section, or because the section was left unattended in commercial establishments by the circulator. It has long been the rule in this state that a circulator must personally witness each signature on a petition. *Morford v. Pyle,* 53 S.D. 356, 220 N.W. 907; *Jensen v. Wells,* 66 S.D. 236, 281 N.W. 99; *Jensen v. Wells,* 66 S.D. 269, 281 N.W. 357.

SDCL 2–1–7 provides:

Every petition proposing a measure must contain the substance of the law desired and *must be signed in person* by the petitioners, and every petition to submit a law to a vote of the electors *must be signed in person* by the petitioners . . . (Emphasis supplied)

The emphasized portion of the statute means that a person may sign only his own name. For this to be meaningful, it follows that each person must sign in the presence of the one who must ultimately attest to the legality of the signatures. This conclusion is buttressed by the words of the affidavit each circulator must sign:

I, being first duly sworn, on oath depose and say that I circulated the above petition, and I hereby attest the legality of the signatures.[2]

(Signed) _____

---

2. SDCL 2–1–10 directs "Every person who shall circulate and secure signatures to a petition" to sign an affidavit prescribed by the State Board of Elections. The State Board of

Elections duly prescribed the affidavit as set out in the text. ARSD 5:02:08:08, as adopted February 17, 1977.

Subscribed and sworn to before me the _____ day of _____, 19_____.

(SEAL)

_____

(Officer Administering Oath)

The purpose of the required affidavit is to establish the genuineness of the signatures on the petition. *Morford v. Pyle, supra.* To say that a person could attest to the "legality of the signatures" without having seen those signatures made is to make the words of the oath empty of meaning. Accordingly, we hold that only those signatures obtained in the presence of the circulator may be counted.[3]

We find that in twelve sections of the petition containing 381 signatures, the circulator did not see any of the petitioners sign the petition. Accordingly, these signatures may not be counted.

■■■ In thirteen sections of the petition containing 760 signatures, the circulators did not personally obtain all of the signatures on the section and were unable to identify which signatures they did obtain. In these instances, the circulators made a percentage estimate of the number of signatures they personally obtained. We may not arbitrarily decide which signatures were signed in the presence of the circulator and which were not. Accordingly, these sections must fail. Admittedly, as a result of this ruling some valid signatures will not be counted; however, as we said in *Morford v. Pyle, supra,* "The person who circulates the petition is the agent of the petitioners, and they are bound by his acts." 53 S.D. at 362, 220 N.W. at 910.

■■■ We also find that thirty-eight sections of the petition were circulated by persons other than the person who signed as circulator. As a result, 1,315 signatures were not personally obtained by the verifying circulator. These signatures may not be counted.

## IMPROPER NOTARIZATION

■■■ Two sections of the petition containing 116 signatures were not notarized. As previously discussed, the form of petitions has been duly established by the State Board of Elections. This form requires that the circulator's affidavit be notarized. Such requirement is not onerous and is designed to insure the integrity of the referendum process. Both *Jensen v. Wells* cases, supra. As we said in *Helgerson v. Riiff,* supra, "The affixing of the official seal by the certifying officer is essential under the statute to the validity of an affidavit." 73 S.D. at 476, 44 N.W.2d at 130. Accordingly, these 116 signatures may not be counted.

■■■ We also find six sections of the petition containing 254 signatures to have defective notarizations. In two instances notaries attested to their own signatures as circulators; in two instances notaries affixed their seals without ever seeing the affiants; and in two instances because the notaries had omitted their official seals a second notary at the Huron headquarters crossed out their signatures and attempted to notarize the documents without having seen the affiants. "Such practice[s] [are] beyond the pale of law and order." *O'Brien v. Pyle,* supra, 51 S.D. at 392, 214 N.W. at 626. Accordingly, these 254 signatures may not be counted.

■■■ We further find that sixty-seven signatures were placed on various sections of the petition after the particular section had been verified and notarized. Not having been verified, these signatures may not be counted.

■■■ Plaintiff challenges several more sections of the petition on various technical faults in notarization. We do not find these objections sufficient to overcome the presumption of regularity attending a notary's signature and seal. *Prigge v. Johns,* 184 Neb. 103, 165 N.W.2d 559; 31A C.J.S. Evidence § 146C.

_____

**3.** Defendant cites *Hassiepen v. Marcin,* 24 Ill. App.3d 97, 320 N.E.2d 572, for the proposition that a layman may attest to a signature not written in his presence. We do not find that decision to be persuasive.

## IMPROPER PETITION FORMS

■ We find that the verification on one section of the petition containing twenty signatures is not in the form prescribed by the State Election Board. We also find that two sheets of paper without proper heading, verification or notarization, containing 103 signatures were filed as part of a section. Defendant concedes, and we agree, that these 123 signatures may not be counted.

## DEFECTIVE SIGNATURES

ARSD 5:02:08:08 as amended is the rule by which the State Board of Elections prescribed the required form for referendum petitions. Under the heading "Instructions to Signers:" the form states:

1. Signers to this referendum must individually sign their name in the form they are registered to vote.

2. Each signer or circulator must add the mailing address of his residence and the date of signing. Place of residence shall be shown by name of city or town, with street and number, if any; if residence is outside of a city or town he should designate the township or precinct or route and box number. (DO NOT USE POST OFFICE BOX NUMBER).

3. Abbreviations, including DITTO MARKS, can be used.

| NAME | RESIDENCE (with street and No., if any) | DATE OF SIGNING |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |

SDCL 2–1–3 provides that "The form of the petition shall be prescribed by the state board of elections." Pursuant to SDCL 1–26, the Administrative Procedure Act, the State Board of Elections prescribed the present form through its rulemaking power.

■ Prior to being amended in 1976, SDCL 2–1–3 provided in part:

[A]nd each elector shall add to his signature his place of residence, including his street and house number, if any be known, if he resides within the corporate limits of an incorporated municipality; or if he resides without the corporate limits of an incorporated municipality, he shall state the name or the number and range used in the legal description of the township wherein he resides, and date of signing.

Defendant argues that by deleting the statutory requirements regarding the contents of the petition and by delegating to the State Board of Elections the duty of prescribing the form of the petition, the legislature intended to abandon the strict requirements of the old statute. As a result, defendant argues, the State Board did not have authority to add any further requirements. Defendant attempts by this argument to distinguish our holding in *Headley v. Ostroot,* 76 S.D. 246, 76 N.W.2d 474, wherein we said:

[T]his court has held, and the holding has been reaffirmed that the requirements of SDC 55.0402 [SDCL 2–1–3] are substantial in character and not merely requirements of form. *State ex rel. Jensen v. Wells,* 66 S.D. 236, 281 N.W. 99; *Shields v. Wells,* 65 S.D. 552, 276 N.W. 246; *Morford v. Pyle,* 53 S.D. 356, 220 N.W. 907; *O'Brien v. Pyle,* 51 S.D. 385, 214 N.W. 623. Implicit in the holding that these statutory requirements are "substantial in character" is the thought that they are important and essential elements of the law giving effect to the constitutional provision relating to the initiative and referendum. Considered in their entirety these requirements are to prevent fraud or corruption in securing the petitions. *Morford v. Pyle,* supra.

\* \* \* \* \* \*

Whether the requirement that a signer of a referendum petition must add his residence in addition to his post office address is a reasonable requirement is to be determined by the legislature in the first instance. The function of the court is only to determine whether this requirement bears any real relation to the duty imposed upon the legislature to give effect to the constitutional provision, or whether the requirement is a palpable invasion of the right to refer a law to the people. In case of doubt, the court should give effect to the will of the legislature. *State ex rel. Richards v. Whisman*, 36 S.D. 260, 154 N.W. 707, L.R.A. 1917B, 1; *Hodges v. Snyder*, 43 S.D. 166, 178 N.W. 575; *Culhane v. Equitable Life Ass'n Soc.*, 65 S.D. 337, 274 N.W. 315.

If effect is to be given to the constitutional provision it is clear that safeguards must be established to prevent fraud and corruption in securing the petitions. In this connection it is essential, we believe, that the petitions disclose information which will readily permit anyone to check the petitions and determine if the signers are qualified. 76 S.D. at 249–250, 76 N.W.2d at 475–476.

Defendant's argument is not well taken. We see no reason to hold that the requirements set out on the petition form are any less mandatory when properly prescribed by the State Board of Elections than when enacted by the legislature.

■ Defendant concedes that thirteen signatures indicating a non-South Dakota address as place of residence may not be counted. We note that SDCL 2-1-3 requires that only qualified electors of this state may sign the petition. These thirteen signatures will not be counted, defendant having conceded the nonresidency of the signers.

■ Further, we find that 323 signers living in larger communities within South Dakota failed to include their street and house numbers along with their signatures. These identifying numbers are required for delivery of the mail in these communities. We also find that 189 signers with residences outside cities or towns included only their townships along with their signatures. The petition form requires mailing addresses of the signers. In the case of city dwellers, this includes the name of the city plus the street and house number. Rural residents must indicate the city or town in which they receive mail plus the township in which they reside. Township names alone are insufficient, as many township names are duplicated in various counties throughout the state. See 1970 Census of Population, Vol. 1, Characteristics of the Population, Part 43, South Dakota. As discussed in *Headley v. Ostroot*, supra, the purpose of these requirements is to prevent fraud and to allow challengers of a petition to verify that the alleged signers are in fact qualified electors of the state. These requirements are not difficult to fulfill, as witnessed by the thousands of petitioners who have met even more stringent requirements in the past, and do not represent an onerous burden upon the right of the people to be heard. Accordingly, these 512 signatures may not be counted.

■ Plaintiff challenges 2,931 signatures of petitioners living in smaller communities within South Dakota who failed to indicate street and house numbers. The referee found that although these communities did have street and house numbers, mail would generally be delivered without such numbers. In keeping with the statutory mandate that the real intention of the petitioners not be defeated by technicalities, we believe that the absence of street and house numbers did not deny plaintiff a reasonable opportunity to verify the signatures of petitioners residing in these communities. We find that under the circumstances here presented, substantial compliance with the prescribed form was achieved through the use of mailing addresses alone. Accordingly, these signatures will not be invalidated.

■ Finally, we find that 304 signers failed to indicate the date on which they signed the petition. All of the requirements of the petition form are placed upon equal footing by the State Board of Elections. They are substantial in character

and must be substantially complied with in order to render signatures valid. *Helgerson v. Riiff,* supra; *Headley v. Ostroot,* supra. The 304 undated signatures must therefore be held to be invalid.

## CONCLUSION

■ To summarize our findings: 13,912 signatures are required to refer an act of the legislature to a vote of the people in the 1978 general election; the referendum petition as filed with the Secretary of State contained 17,666 signatures; allowing for duplications, we find 4,958 of the signatures to be invalid, leaving 12,708 valid signatures on the petition. Accordingly, the petition falls 1,204 signatures short of the statutory minimum.

A writ of prohibition will be issued restraining defendant from certifying Ch. 240, Laws of 1978, to a vote of the people at the election to be held on November 7, 1978.

PORTER and MORGAN, JJ., concur.

DUNN and ZASTROW, JJ., concur specially.

ZASTROW, Justice (concurring specially).

Although I concur with the finding of the majority that there are insufficient valid signatures to refer SL 1978, Ch. 240 to a vote of the citizens, I would hold many more of the signatures invalid than the majority opinion has.

The proponents of this referendum admit to a course of conduct as to some 2,000 signatures, which was a clear violation of statutory requirements. Those signatures were obtained on petitions circulated by persons unknown or unnamed in various cities and towns throughout the state. The petitions, without the circulator's verification, were then mailed to the Huron office of the National Farmers Union Insurance Company. There, one employee of the insurance company, admittedly without knowledge of the authenticity of the signatures, executed the verification as the circulator and another employee acted as notary. Other petition verifications were received

unnotarized and the employee at the Huron office would notarize the verification even though it was neither signed nor acknowledged in her presence. In one instance, the signature of the notary who had attested the verification but failed to apply his seal was crossed out and the employees at the Huron office signed and sealed the petition as notary. These acts were intentional violations of the election laws and the notaries oath.

Although the proponents concede the signatures invalidity where these illegal acts are readily apparent, they ask this court to invalidate those signatures but impose the burden of proof upon the opponents to establish that there was actual deceit involved in the other irregularities. These other irregularities involve petitions where the signatures were not obtained in the presence of the circulator and some where the person executing the verification as circulator had turned the petition over to another person or persons to circulate. With full knowledge of these circumstances, they signed an affidavit to the effect: *"I being first duly sworn, on oath depose and say that I circulated the above petition and I attest the legality of the signatures."* In spite of the obvious falsity of these verifications, the proponents assert that the people's right to a referendum should not be thwarted by "mere technicalities" and that the referendum petitions should be "liberally construed" to carry out the wishes of the voters. SDCL 2–1–11. I wholeheartedly agree with those principles, but I cannot agree that they should apply to these circumstances.

Do not the proponents by admitted illegal activities forfeit their right to a liberal construction of the remaining petitions where the same practice may or may not have prevailed, but where the statute was not followed in obtaining valid signatures? I find that to be the intent of the language of this court in *State v. Riiff,* 73 S.D. 467, 474, 44 N.W.2d 126, 129:

It [is] recognize[d] that intent to deceive is not ordinarily susceptible of direct proof and in the absence of evidence to

the contrary may be presumed where the falsity was necessarily known to the affiant. The effect of such presumption is to cast upon the party seeking to sustain the validity of a petition the burden of producing evidence to show that affiant acted in good faith.

It is clear that the circulators of the petitions in question knew of the falsity of the verification when the petitions were not signed in their presence or were circulated by third persons. The burden was then upon the proponents to prove good faith of the circulator; absent such proof the entire petition should be invalidated.

Since my position does not change the result of the majority opinion, but would merely decrease the already insufficient number of valid signatures, I will not make analysis of each petition. However, under the admitted circumstances here, I would impose a strict enforcement of the statutes and rules on the petitions in question.

I am authorized to state that Justice DUNN joins in this special concurrence.