Helen BARGER, As Guardian Ad Litem for and General Guardian of the Person and Estate of Samuel Jay WARES, an Incapacitated Person, Plaintiff and Appellant,

v.

Raymond COX, Special Administrator of the Estate of Steven Guy Cox, Deceased, and Latchstring Inn, Inc., A South Dakota Corporation, Defendants and Appellees.

No. 14422.

Supreme Court of South Dakota.

Argued Oct. 24, 1984.

Decided July 31, 1985.

Rehearing Denied Aug. 28, 1985.

---

Jerry D. Johnson of Banks & Johnson, Rapid City, for plaintiff and appellant.

Gene R. Bushnell of Costello, Porter, Hill, Nelson, Heisterkamp & Bushnell, Rapid City, for defendant and appellee Raymond Cox.

Donald R. Shultz of Lynn, Jackson, Shultz & Lebrun, Rapid City, for defendant and appellee Latchstring Inn, Inc.

WOLLMAN, Justice (on reassignment).

This appeal involves a negligence action for personal injuries arising out of an automobile accident that occurred in the early

morning hours of June 10, 1978, on U.S. Highway 85 near Lead in Lawrence County. Appellee Raymond Cox is the special administrator of the estate of his son, Steven Cox, deceased. Appellant, Helen Barger (Barger), is the guardian ad litem of her son, Samuel Wares. The trial court granted defense motions for summary judgment in favor of appellee Raymond Cox and appellee Latchstring Inn, Inc. (Latchstring). We affirm.

The pleadings, depositions, and answers to interrogatories established the following facts.

Latchstring is a resort in Spearfish Canyon near the small community of Savoy. Latchstring consists of fourteen cabins, a restaurant, coffee shop, souvenir shop, and a lounge for on-sale liquor. At the time of the accident in question, Judith Woodworth (Woodworth), whose husband and mother-in-law owned all of the shares of the corporation, was the secretary-treasurer and manager of Latchstring. On May 13, 1978, Woodworth hired Samuel Wares (Wares), age sixteen, a Lead High School student, as a dishwasher and yard worker. Wares worked weekends until the end of the school year, at which time he was allowed to stay in a cabin reserved for Latchstring's minor male employees. A separate cabin was reserved for Latchstring's minor female employees.

Woodworth imposed several restrictions on Latchstring's minor employees. The male and female employees were not to "mix" in the cabins. To insure compliance with this rule, Woodworth housed the female employees on one side of the grounds and the males on the other, with Woodworth residing in a cabin between them. Minor employees could have automobiles at Latchstring only if their parents agreed. They were not to drink alcoholic beverages, and if any drugs were found the minor employees would be fired. Their cabins were to be kept clean, and they were not allowed to have their friends from town in their cabins.

Woodworth had not had any problem with the girls mixing with the boys in their cabins. Neither had she had any problem with the minor employees drinking alcoholic beverages either in 1978 or in 1977. Woodworth had imposed no specific curfew in terms of a time when the lights had to be turned out, assuming that because the minor employees worked so hard they would go to bed early. It was her practice to check the cabins once every two weeks or so. In addition, the parents of the minor employees usually checked the cabins for cleanliness when they came to pick up their children on their days off or on payday. Woodworth found no beer or liquor bottles in the cabins either in 1977 or in 1978, nor did she find any evidence of drugs. Woodworth had no knowledge that the male minor employees had had any parties in their cabin or had any boys from town visit them during 1978. The only time that she visited the minor employees' cabins in the evening was when she received complaints from the tourists that the music from the employees' stereos was too loud.

On the evening of June 9, 1978, Woodworth went to her living quarters after getting off work at 8:00 p.m., which was closing time. She went to bed at approximately 9:30 p.m. and heard nothing further until 6:30 the next morning, when someone brought her news of the accident.

On June 9, 1978, Robert Hyde (Hyde) and Troy Lipp (Lipp), two boys from Lead, heard there was a party at Latchstring. They purchased two six-packs of beer, arrived at Latchstring between 8:30 and 9:30 p.m., and went to a cabin occupied by Wares and three other minor employees, Steven Cox (Cox), age seventeen, Brian Sieveke (Sieveke), and Darwin Johnson. Hyde testified that there was already beer at the cabin and that Wares was intoxicated when Hyde and Lipp arrived. During the evening, Wares, Cox, Hyde, and Lipp smoked marijuana. Wares drank whiskey, while the three others drank beer.

The party continued into the early morning hours of June 10, 1978, but came to a halt when Wares tripped, fell, and dislocated his elbow, which protruded as a result of the fall and caused Wares to scream in

pain. Cox borrowed Sieveke's Jeep in order to take Wares to a hospital in Lead. Sieveke instructed Cox to drive under fifty miles per hour. Cox drove the vehicle, with Wares in the front passenger seat and Lipp and Hyde in the rear. Hyde testified that Cox was sober at the time they set out for the hospital.

The young men proceeded toward Lead via U.S. Highways 85 and 14A. Cox unintentionally crossed the center line several times in negotiating the many curves in the highway. Cox was driving within safe speed limits, and Hyde and Lipp complimented him on his driving. The vehicle did not swerve nor did the tires squeal on the curves. Lipp told Cox to "watch out for Deadman's Curve," to which Hyde responded by telling Cox not to worry about it. Wares, who was in extreme pain, yelled at Cox to drive faster.

After proceeding some fourteen or fifteen miles towards Lead, the group approached what is known locally as "Deadman's Curve." As the Jeep entered the curve at between 45 to 60 miles per hour (the posted speed limit was either 35 or 40 mph) its rear end began to slide around. Cox straightened the Jeep out long enough to cause Lipp to say they had made it. The vehicle then suddenly flipped over on its side, skidded across the road, and went into a creek. Cox and Lipp were killed in the accident. Wares remembers nothing about the circumstances leading to the accident.

Hyde testified that he had been at Latchstring on some five prior occasions during 1978, on three of which occasions he and the others drank alcoholic beverages and smoked marijuana. On one occasion while Hyde was on the premises in the evening, Woodworth came to the cabin and told the young men to turn down the music. He further testified that on the night in question the music was being played at a level that permitted them to carry on a conversation.

Hyde testified that when he and Lipp arrived at the cabin, Sieveke was already in bed and that Johnson went to bed at approximately 11:00 p.m. There was no door on the opening between bedroom and the living room area. Hyde also testified that he knew of nothing that would indicate that Woodworth had any idea he and Lipp were in the cabin with Cox and the others on the night of June 9–10.

### I.

### Guardian's Cause of Action for Medical and Hospital Expenses

■ Barger contends that she has an independent right of recovery for medical and hospital expenses incurred by her on behalf of her injured child that survives a bar to the child's recovery under our former guest statute, SDCL 32–34–1.* In granting a defense motion for summary judgment on the issue, however, the trial court held that Barger's right of recovery is derivative in nature and not a new cause of action and, therefore, SDCL 32–34–1 applied to her claim. We agree.

A number of courts have held that a parent's right of action for consequential damages incurred because of negligent injury to a child, although distinct from the child's right of action, is derivative therefrom inasmuch as it is based upon and arises out of the negligence which caused the injury. *See, e.g., Warner v. Pruett,* 599 S.W.2d 207 (Mo.App.1980); *O'Hearn v. O'Hearn,* 55 A.D.2d 766, 389 N.Y.S.2d 651 (1976); *Whitehead v. General Telephone Co.,* 20 Ohio St.2d 108, 254 N.E.2d 10 (1969); 59 Am.Jur.2d *Parent and Child* § 112 (1971). Consequently, the parent cannot recover unless the child also has a good cause of action. *Welter v. Curry,* 260 Ark. 287, 539 S.W.2d 264 (1976); *Bias v. Ausbury,* 369 Mich. 378, 120 N.W.2d 233 (1963); *Fekete v. Schipler,* 80 N.J.Super. 538, 194 A.2d 361 (1963); *Dudley v. Phillips,* 218 Tenn. 648, 405 S.W.2d 468 (1966).

---

* SDCL 32–34–1 was repealed by 1978 S.D.Sess. Laws ch. 240, § 2. *See Nist v. Herseth,* 270 N.W.2d 565 (S.D.1978).

In *Irlbeck v. Pomeroy*, 210 N.W.2d 831 (Iowa 1973), a case similar to the instant action, the Iowa Supreme Court held that although the minor was a guest passenger in the vehicle in question, Iowa's guest statute was not a defense to the mother's action for loss of services, companionship and society. The Court stated:

A true derivative action is one which a person may institute to redress a wrong done to another. Our survival statute Code § 611.20 is an example. The cause of action accruing to a fatally injured person survives his death and is maintainable by his estate representative, subject to any defense which could have been raised against the decedent....

The present action is not that kind of derivative action....

" * * * [T]he wrongful or negligent death of a minor gives rise in Iowa to two causes of action, one on behalf of the minor's administrator for those injuries which are personal to the decedent, section 611.20, the other on behalf of the father for loss of services during minority and expenses incurred on account of those injuries, rule 8. *Actions brought under rule 8 are not for the injury to the child but for the injury to the father as a consequence of the injury to the child.... Wardlow v. City of Keokuk*, [190 N.W.2d 439, 443 (Iowa 1971) ] *supra.* [Emphasis added by the Iowa court.]"

210 N.W.2d at 832–33. Although it may be correct to say that actions such as this are not truly derivative in the sense that the person who incurs the medical and hospital expenses, i.e., the parent, is the person injured, nonetheless that injury arises out of and is a consequence of the injury to the child. As stated in *Shiels v. Audette*, 119 Conn. 75, 78, 174 A. 323, 325 (1934):

An act or omission of a person which causes a loss of the services of a minor child to a parent, or necessitates expenditures to cure an injury done to the child, entitles the parent to recover damages when it appears that the act or omission is one which the law holds to be a legal wrong.... [I]n such a case as this, where the basis of the claimed wrongful conduct is the failure of the defendant to take certain steps to prevent the child from suffering injury, the parent cannot recover unless that failure constituted a legal wrong to the child.

*Accord: Tisko v. Harrison*, 500 S.W.2d 565 (Tex.Civ.App.1973).

There is an analogy to the situation where husband and wife have causes of action for injuries to the wife. In *Callies v. Reliance Laundry Co.*, 188 Wis. 376, 380, 206 N.W. 198, 200 (1925), it was stated:

The parent is by law required to support and care for his child. In return for the performance of such obligation, the law gives to the parent the right to a part of the child's cause of action in case he is negligently injured by another. So also since the husband is required to support his wife the law likewise gives him a part of the wife's cause of action in case she is negligently injured by another. This splitting up of the cause of action resulting in some of the damages being given the child and some to the parent, or some to the wife and some to the husband, is due solely to the parental and marital relations existing between the parties.... But for such relations and obligations the entire damages would belong to the child or wife[.]

In *Titze v. Miller*, 337 N.W.2d 176 (S.D. 1983), we classified a husband's cause of action for loss of consortium as derivative in nature, even though the right of consortium is a personal right and a separate and distinct cause of action. If the injured spouse is unable to recover for his own personal injuries, the cause of action of the other for loss of consortium also fails. *Bitsos v. Red Owl Stores, Inc.*, 350 F.Supp. 850 (D.S.D.1972); *Budahl v. Gordon David & Associates*, 287 N.W.2d 489 (S.D. 1980); *Wilson v. Hasvold*, 86 S.D. 286, 194 N.W.2d 251 (1972).

We conclude, therefore, that the trial court was correct in ruling that our former guest statute operated as a bar to Barger's

action for medical and hospital expenses. Accordingly, we affirm the trial court's summary judgment on this issue.

## II.

### Guest Statute Defense

Barger's next contention is that the trial court erred in ruling as a matter of law that Cox's operation of the vehicle in question did not constitute willful and wanton misconduct.

SDCL 32–34–1 provided:

> No person transported by the owner or operator of a motor vehicle as his guest without compensation for such transportation shall have cause of action for damages against such owner or operator for injury, death, or loss, in case of accident, unless such accident shall have been caused by the willful and wanton misconduct of the owner or operator of such motor vehicle, and unless such willful and wanton misconduct contributed to the injury, death, or loss for which the action is brought.

To exclude a passenger from the operation of the guest statute

> (1) [t]he driver must receive some benefit from transportation, either alone or in common with his rider and such benefit must be sufficiently real, tangible, and substantial to serve as an inducing cause of the transportation so as to operate to completely overshadow any considerations of mere hospitality growing out of the friendship or relationship, or (2) the accident or injury must have been caused by the willful or wanton misconduct of the owner or operator of the vehicle.

*Tranby v. Brodock,* 348 N.W.2d 458, 460 (S.D.1984), *citing Lukens v. Zavadil,* 281 N.W.2d 78 (S.D.1979).

The parties do not take issue with the fact that Wares was a guest in the vehicle. Accordingly, we need determine only whether Cox was guilty of willful and wanton misconduct. As we stated in *Tranby, supra,* at 461:

> Willful and wanton misconduct means something more than negligence. It de-scribes conduct which transcends negligence and is different in kind and characteristics. It is conduct which partakes to some appreciable extent, though not entirely, of the nature of a deliberate and intentional wrong. There must be facts that would show that defendant intentionally did something in the operation of the motor vehicle which he should not have done or intentionally failed to do something which he should have done under the circumstances that it can be said that he consciously realized that his conduct would in all probability, as distinguished from possibility, produce the precise result which it did produce and would bring harm to plaintiff. Willful and wanton misconduct demonstrates an affirmative, reckless state of mind or deliberate recklessness on the part of the defendant.... *Brewer v. Mattern,* 85 S.D. 356, 182 N.W.2d 327 (1970)[.]

The record is clear that there are no facts that would support a finding that Cox was guilty of willful and wanton misconduct. Cox was not on an aimless joy ride for thrills and excitement. Rather, he made the trip to take an injured friend to a hospital, losing his own life in attempting to accomplish this mission of mercy. Although Cox had been warned to watch out for "Deadman's Curve," the record indicates that none of the occupants complained that he was driving too fast or recklessly. Indeed, Hyde and Lipp complimented him on his driving. Wares himself implored Cox to drive faster. Although Cox had been drinking beer and smoking marijuana, Hyde, the only witness who testified to his condition, stated that Cox appeared to be sober. On the basis of these facts, then, which are far less aggravated than those in *Tranby, supra,* in which we held that the cause of action was barred by the guest statute, we hold that the trial court properly granted summary judgment on this issue.

## III.

### Cause of Action Against Latchstring

Finally, Barger argues that the trial court erred in granting summary judgment

in favor of Latchstring on the basis of its determination that Latchstring had no duty to supervise and control the conduct of its minor employees while they were on its premises after working hours.

In *Erickson v. Lavielle,* 368 N.W.2d 624 (S.D.1985), we reiterated our holdings that the existence of a duty of care on the part of a defendant to a plaintiff is an essential element of a negligence action. *See, e.g., Leslie v. City of Bonesteel,* 303 N.W.2d 117 (S.D.1981); *Johnson v. Straight's, Inc.,* 288 N.W.2d 325 (S.D.1980); *Cuppy v. Bunch,* 88 S.D. 22, 214 N.W.2d 786 (S.D.1974); *Ecklund v. Barrick,* 82 S.D. 280, 144 N.W.2d 605 (1966); *Stoner v. Eggers,* 77 S.D. 395, 92 N.W.2d 528 (1958).

The concepts of duty and the standard of care owed a plaintiff are distinct but interdependent:

> It is better to reserve "duty" for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other, and to deal with particular conduct in terms of a legal standard of what is required to meet the obligation. In other words, "duty" is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty. The distinction is one of convenience only, and it must be remembered that the two are correlative, and one cannot exist without the other.

Prosser & Keeton on *The Law of Torts* § 53, at 356 (5th Ed.1984). *See Goff v. Wang,* 296 N.W.2d 729 (S.D.1981).

■ The existence of a duty is a question of law to be determined by the court. *Erickson v. Lavielle, supra,* and authorities cited therein; Prosser, *supra,* § 37, at 236.

Restatement (Second) of Torts § 315 (1965) provides:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

"The special relations referred to in clause (a) are found in [Restatement (Second) of Torts] §§ 316–319...." *Cuppy v. Bunch,* 88 S.D. at 25, 214 N.W.2d at 788. Section 317 provides:

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

■ The trial court held that Latchstring had no knowledge that it had the ability to control its employees or that it should know of the necessity and opportunity for exercising such control. We conclude, however, that by imposing restrictions on its minor employees, including the ban of alcohol and drug use, Latchstring recognized that it had the ability to control its minor employees and that it was necessary for it to exercise such control. By voluntarily assuming and exercising such control, Latchstring assumed a duty of supervision. *Cf. Erickson v. Lavielle, supra;*

*Steckman v. Silver Moon,* 77 S.D. 206, 90 N.W.2d 170 (1958).

We need not decide whether in the absence of its affirmative action in exercising supervision and control over the after-hours activities of its minor employees Latchstring would have been under a legally-imposed duty to do so. We do note, however, that the minors in the case before us were "children" only in the technical, legal sense of the word and were certainly not entitled to the solicitude due, say, a four-year-old child. *See Schroeder v. Donlin,* 79 S.D. 311, 111 N.W.2d 609 (1961). Nor were the minor employees employed or permitted to engage in a highly dangerous activity on Latchstring's premises. *Cf. Bucholz v. City of Sioux Falls,* 77 S.D. 322, 91 N.W.2d 606 (1958). It is enough for the purposes of the case before us to hold that Latchstring recognized that it had a duty of control over its minor employees and that it had undertaken to exercise that control.

There remains the question whether Latchstring was negligent in exercising control over its minor employees.

■ Plaintiff presented no evidence that would support a finding that Woodworth was aware, or should have been aware, that on the night in question Wares and his companions were violating the rules that prohibited the use of alcohol or drugs. Woodworth had made it clear to the young men that they were absolutely forbidden to drink alcoholic beverages and to use drugs. These prohibitions were, of course, also imposed upon the minor employees as a matter of state law. *See* SDCL 35-9-2; 35-9-4; SDCL ch. 22-42. As we indicated above, the minors were children only within the legal definition of that term. They were treated as responsible individuals and in turn were expected to act as such. In the absence of any knowledge that they were not doing so, Latchstring should not be charged with the duty of monitoring their behavior on a 24-hour-a-day basis.

■ Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. SDCL 15-6-56(c). We have adopted the principle that an affirmance of a trial court's grant of summary judgment is proper if there exists any basis which would support the court's ruling. *Ruple v. Weinaug,* 328 N.W.2d 857 (S.D.1983); *Maryland Casualty Co. v. Delzer,* 283 N.W.2d 244 (S.D.1979).

Reasonable persons could not differ regarding the conclusion to be drawn from the facts presented, and Latchstring was accordingly entitled to the entry of summary judgment. *Myers v. Lennox Co-op Ass'n,* 307 N.W.2d 863 (S.D.1981).

The summary judgment is affirmed in its entirety.

FOSHEIM, C.J., and MORGAN, J., concur.

HENDERSON, J., and WUEST, Acting Justice, dissent.

HENDERSON, Justice (dissenting).

For the reasons that I believe questions of fact existed for a jury's determination, I respectfully dissent.

### SUMMARY JUDGMENT

Summary judgment is properly awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to a judgment as a matter of law." SDCL 15-6-56(c) (emphasis supplied). Although summary judgment is appropriate in all types of litigation, it is *not generally suitable in negligence actions. Wilson v. Great Northern Ry. Co.,* 83 S.D. 207, 212-13, 157 N.W.2d 19, 22 (1968). This is because issues of negligence, contributory negligence, proximate cause, and other related issues

are ordinarily questions of fact and it must be a clear case before a trial judge is justified in taking these issues from the jury. It is only when the evidence is such that reasonable men can draw but one conclusion from facts and inferences

that they become a matter of law and this occurs *rarely.*

157 N.W.2d at 22 (emphasis supplied). As recent as December 12, 1984, this Court stated in *Hoffman v. Royer,* 359 N.W.2d 387, 390 (S.D.1984): "Questions relating to negligence and contributory negligence are questions of fact for determination by the jury in all except the rarest of instances." (Quoting *Stoltz v. Stonecypher,* 336 N.W.2d 654, 657 (S.D.1983)). When addressing a motion for summary judgment, it is to be remembered that (1) evidence must be viewed most favorable to the nonmoving party; (2) the movant has the burden of proof to clearly show that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law; (3) summary judgment is not a substitute for a trial on the merits when any genuine issue of material fact exists; (4) a surmise that nonmoving party will not prevail at trial is not appropriate basis for granting the motion on issues not shown to be frivolous, sham, or so unsubstantial that it is obvious that it would be futile to try them; and (5) *summary judgment is an extreme remedy* which should be awarded only when the truth is clear and reasonable doubts as to the existence of genuine issues of material fact should be resolved against the movant. 157 N.W.2d at 21. Further, on June 6, 1984, this Court stated in *Nemec v. Deering,* 350 N.W.2d 53, 55–56 (S.D.1984), that "[o]rdinarily, whether a defendant has breached the required standard of care is a question of fact for the jury." If the reader will review these recent cases and the principles established in *Wilson,* a manifest conclusion will result, namely, that the facts and events of this night of maimed bodies and death cry out for a jury's deliberation.

With the foregoing Court-enunciated principles in mind, I address the issues presented herein.

## BARGER'S CAUSE OF ACTION FOR MEDICAL AND HOSPITAL EXPENSES

A parent's cause of action for medical and hospital expenses incurred because of the negligent injury of a child is a separate, distinct, and independent cause of action from that vested in the child itself. *See Alabama Farm Bureau Mutual Cas. Ins. Co. v. Williams,* 365 So.2d 315 (Ala.Civ. App.1978); *Welter v. Curry,* 260 Ark. 287, 539 S.W.2d 264 (1976); *Botelho v. Curtis,* 28 Conn.Supp. 493, 267 A.2d 675 (1970); *Tucker v. Shelby Mutual Ins. Co. of Shelby, Ohio,* 343 So.2d 1357 (Fla.App.1977); *Jones v. City Council of Augusta,* 100 Ga.App. 268, 110 S.E.2d 691 (1959); *Rader v. Collins,* 130 Ind.App. 227, 161 N.E.2d 381 (1959); *Zarba v. Lane,* 322 Mass. 132, 76 N.E.2d 318 (1947); *Walter v. City of Flint,* 40 Mich.App. 613, 199 N.W.2d 264 (1972); *Friedrichsen v. Niemotka,* 71 N.J. Super. 398, 177 A.2d 58 (1962); *Grange v. Town of Yorkshire,* 22 A.D.2d 752, 253 N.Y.S.2d 719 (1964); *Travelers Indem. Co. v. Godfrey,* 12 Ohio Misc. 143, 41 Ohio Op.2d 166, 230 N.E.2d 560 (1967); *Wolff v. DuPuis,* 233 Or. 317, 378 P.2d 707 (1963); *Meisel v. Little,* 407 Pa. 546, 180 A.2d 772 (1962); *Trotti v. Piacente,* 99 R.I. 167, 206 A.2d 462 (1965); *Hall v. Royce,* 109 Vt. 99, 192 A. 193 (1937). Thus,

[a]n injury to a minor child gives rise to two causes of action, one on behalf of the child for pain and suffering, permanent injury, and impairment of earning capacity after attaining majority, the other on behalf of the parent for loss of services during minority, expenses of treatment, and other elements of damage....

67A C.J.S. *Parent and Child* § 137, at 518 (1978). The object of the parent's cause of action is the recovery of expenses which the parent has paid and services which the parent has lost, while the object of the child's cause of action is a recovery for the personal injury inflicted upon its being. The parent's action is not brought for the injury to the child, but instead is brought for the wrong, injury, or loss suffered by the parent as a consequence of the child's injury. This principle should be particularly applicable in view of SDCL 25–5–7, which provides:

The father and mother of a legitimate unmarried minor child are equally enti-

tled to its custody, service, and earnings. If either the father or mother be dead or refuse to take the custody or has abandoned his or her family, the other is entitled to its custody, service, and earnings.

Although a parent's cause of action is separate, distinct, and independent from that vested in the injured child, it is still subject to any defense that could be raised to negate the existence of a cause of action in the injured child. 67A C.J.S. *Parent and Child* § 143, at 528 (1978). Thus, Barger's suit (brought by the mother and guardian of Wares who suffers organic brain damage) *could* be negated by the former guest statute if Cox's driving on the night in question was not willful or wanton misconduct.* Because I would hold, as outlined below, that a question of fact exists as to whether Cox's driving constituted willful and wanton misconduct, I would reverse the trial court's summary judgment determination that the former guest statute barred Barger's claim.

### GUEST STATUTE DEFENSE—QUESTION OF FACT REGARDING WILLFUL AND WANTON MISCONDUCT

As stated above, if Cox's operation of the Jeep on June 10, 1978, did not amount to willful and wanton misconduct, Barger's cause of action would be barred by the former guest statute. The trial court found that no genuine issue existed as to Cox's willful and wanton misconduct and the majority would affirm that determination. In light of the facts as adduced from the summary judgment hearing, however, and in light of our Court-enunciated summary judgment principles, I dissent.

Cox had been drinking beer and smoking marijuana before embarking on the fatal journey. Although one of his companions testified that Cox appeared sober, Cox had a blood alcohol content of .13 and thus was

driving while intoxicated. He was warned not to drive the Jeep over fifty miles per hour. Cox operated the Jeep in excess of the speed limit and crossed over the center line while negotiating curves. It was dark and early in the morning and Cox was driving down a steep, curved, downhill grade of Highway 85 and 14A. Cox was warned about Deadman's Curve but continued to exceed the speed limit. The skid and scrape marks left on the road measured a total of 727 feet and the vehicle was extensively damaged. Further, the Patrolman who initially investigated the accident indicated in his Officer's Investigation Summary of Motor Vehicle Accident that the primary cause of the accident was "Speed—Reckless Driving."

Construing the above most favorably to Barger (the nonmoving party), I am unable to find such a clear case that reasonable men could draw but one conclusion, to wit, that Cox's operation of the vehicle was not willful and wanton misconduct as the trial court and majority have so held. On the contrary, if a genuine question of fact does not exist, I would hold that reasonable men could draw but one conclusion, to wit, that Cox's operation of the vehicle was willful and wanton misconduct.

Although excessive speed alone is not sufficient to constitute willful and wanton misconduct, *Mitzel v. Hauck*, 78 S.D. 543, 105 N.W.2d 378 (1960), speed, coupled with knowledge and warning of dangerous road conditions, is relevant in guest statute cases and sufficient to establish recklessness. *See Anderson v. Elliott*, 244 Iowa 670, 57 N.W.2d 792 (1953); *Tucker v. Heaverlo*, 249 Iowa 197, 86 N.W.2d 353 (1957); *Horton v. Fleser*, 340 Mich. 68, 64 N.W.2d 605 (1954). Here, the effects of intoxicants and marijuana, coupled with excessive driving speed, dangerous road conditions and knowledge and warning thereof, most as-

---

\* For cases holding the parent's cause of action to be barred by the application of a guest statute to the child's cause of action, *see Shiels v. Audette*, 119 Conn. 75, 174 A. 323 (1934); *Lynott v. Sells*, 52 Del. 385, 158 A.2d 583 (1958); *Whitfield v. Bruegel*, 134 Ind.App. 636, 190 N.E.2d 670 (1963); *Tisko v. Harrison*, 500 S.W.2d 565 (Tex. Civ.App.1973); and *Hall v. Royce*, 192 A. 193. *Contra, Shiels*, 174 A. at 326 (Haines, Judge, dissenting in part), and *Irlbeck v. Pomeroy*, 210 N.W.2d 831 (Iowa 1973).

suredly created a question of fact concerning willful and wanton misconduct which a jury should resolve. It is apparent that the majority opinion substitutes the defense of the assumption of the risk as a bar to the willful and wanton misconduct cause of action. There is no doubt that the representatives of Cox have every right, in law, to plead and prove up an assumption of the risk defense. Perhaps, indeed, such a defense is classical under these facts. Moreover, the theorist in law can hypothesize that such a defense, under these facts, would be justly palatable to the jury. However, for the majority to assume that the assumption of the risk facts are so strong that they estop a prima facie case of willful and wanton misconduct, is an academic flaw. It begs, before one scintilla of proof is adduced, a total acceptance of an affirmative defense. Even where evidence has been produced, i.e., where one side has had a chance to swing at the ball before they are thrown out of court, we have held: "Questions of assumption of the risk and contributory negligence are ordinarily jury questions, and it is only when the facts are of such a nature that there can be no disagreement that the question should not be submitted to the jury." *Berg v. Sukup Mfg. Co.*, 355 N.W.2d 833, 835 (S.D.1984). Here, plaintiff/appellant was called "out" before she got to the plate.

## LATCHSTRING'S DUTY OF CARE— QUESTION OF FACT REGARDING ITS VIOLATION

Although I agree that Latchstring most assuredly assumed supervision and control over the after-hours activities of its teenage employees, and thus owed a duty of care, I disagree with the majority ruling that a question of fact does not exist as a matter of law concerning Latchstring's violation of that duty.

Here, Latchstring, in effect, sold a bill of goods to the parents of these teenagers which showed that it was a good, clean operation and that the teenagers were to abide by certain rules. These rules provided that (1) the boys and girls were not supposed to mix but were to stay in their separate cabins; (2) cars were allowed only if the parents agreed; (3) no drinking; (4) no drugs; (5) no friends from town in the cabins; and (6) the cabins were to be kept clean and would be inspected every other week. These rules, I surmise, were implemented not only to insure the orderly operation of Latchstring, but to cajole the teenagers' parents who obviously would not permit their children to be placed during the summer in a marijuana/alcohol/sex/orgy in a relatively remote portion of the Black Hills for fear their children would be raped, addicted, mugged, impregnated, killed, kidnapped, or that some other disaster would befall them. Having constructed and implemented these rules, and estranged these teenagers from other supervision, Latchstring had a duty of care with respect to their safety. The question thus becomes: Did the trial court err when it ruled, as a matter of law, that no genuine issue of fact existed in regard to Latchstring's violation of this duty owed? Believing a question of fact did exist, I would reverse the trial court's summary judgment order. As authority, I rely on settled law in this state that "[i]n reviewing an order for summary judgment, this Court must consider the evidence in a light most favorable to the non-moving party...." *Goff v. Wang,* 296 N.W.2d 729, 730 (S.D.1980).

As Acting Justice Wuest points out in his dissenting opinion herein, a duty to supervise teenagers cannot be discharged by merely establishing a set of rules and then failing to check on compliance. After implementing the rules hereinbefore stated, and between the end of high school (May 27) and the night of the accident (June 9–10), approximately thirteen days, three parties were held at the boys' cabin at Latchstring. At all three parties, booze was consumed, marijuana was smoked, girls and boys "mixed," teenagers from town were present, and loud music was played. During one of these parties, Woodworth, Latchstring's manager, in response to a guest complaint, went to the boys' cabin and told them to keep the music

down. If Woodworth did not actually know such activities were taking place at Latchstring, she should have known. It was her responsibility to supervise these teenagers; the majority opinion recognizes Woodworth—on behalf of Latchstring— had undertaken a duty of care and control over these teenagers. These three parties suggest that the duty ·of care and control did not meet a standard of ordinary care. No reasonable, prudent business, encharged with such responsibility, would tolerate, condone, or permit wild, raucous employee parties on its premises. From the facts, it may be reasonably inferred that Woodworth either knew or should have known what was going on in this closely confined, isolated area in the Black Hills with these teenagers who were working at summer jobs.

"A genuine issue of fact exists where, on the basis of facts in the record, reasonable minds could differ on whether defendant's conduct measures up to the required standard." *Nemec v. Deering*, 350 N.W.2d at 56 (citation omitted). Here, considering the evidence in a light most favorable to the nonmoving party, Barger, we must conclude that, at the very least, reasonable minds could differ on the issue of breach of a duty owed. Simply put, it is inescapable that there are general issues of material fact. Summary judgment was not appropriate. We, in the legal profession, pride ourselves in the jury system. We tell the laymen this at testimonial dinners and in speeches of state. Need I remind anyone that the plaintiff in this case is simply asking for an opportunity to submit her case to a jury? The facts and events of this night of maimed bodies and death cry out for a jury's deliberation.

I would reverse the summary judgment in its entirety.

WUEST, Acting Justice (dissenting).

I agree with the majority on issues I and II and that part of issue III holding that "Latchstring recognized that it had a duty of control over its minor employees and that it had undertaken to exercise that control." It is my opinion, however, that whether Latchstring was negligent in discharging that duty is a factual question for the jury.

The majority refers to these young people as technically "children." The legislature has designated the age of minority and the court should not amend that designation. At what age does a real child become a technical, legal child?

Capacities of children vary greatly, not only with age but also with individuals of the same age. The objective standard of the reasonable prudent person does not apply to a minor, but, rather, a special (subjective) standard of care is used which takes into account his age, intelligence, experience, and capacity. *Alley v. Siepman*, 87 S.D. 670, 214 N.W.2d 7 (S.D.1974); *Finch v. Christensen*, 84 S.D. 420, 172 N.W.2d 571 (S.D.1969). Because there is a sufficient basis of community experience on the part of those who have been children or dealt with them, the jury should be permitted to make those decisions rather than the court. Only when the minor's conduct was so unreasonable in view of his estimated capacity may the minor be found contributorily negligent as a matter of law. *Alley, supra.*

The majority opinion seems to be arguing the contributory negligence theory, but says there was not any evidence that Woodworth was aware, or should have been aware, that on the night in question Wares and his companion were violating the rules prohibiting alcohol or drugs. The argument seems to be that Woodworth was not negligent because the minors were contributorily negligent. It is my opinion that the first issue is "duty," which the majority admits. The second issue is whether Woodworth breached the duty. If not, that is the end of the lawsuit and a discussion of contributory negligence is unnecessary. Further, in my opinion, having assumed a duty, there is a jury issue as to whether Woodworth properly supervised these minors.

Teenage drinking and driving is a national epidemic and disgrace. It is so bad the

federal government is urging the states to raise the drinking age to twenty-one. Alcohol-related automobile accidents are the number one cause of death among young adults. Every day the national and local media promote alcohol-free graduation parties and other ideas to reduce drinking and driving among teenagers and young adults. I do not believe a parent, guardian, or anybody else assuming a duty, including Latchstring, can tell a teenager "no drinking," thereby discharging their responsibility like an ostrich with its head in the sand. Perhaps, a jury would decide that Woodworth discharged her duty; but, perhaps, it would decide that she should have done more, such as an occasional bed check. Woodworth's negligence, if any, was a failure to properly perform a duty she had undertaken. A jury should decide whether or not she had done enough under the circumstances. If the jury should hold Latchstring negligent, there is still a serious issue of proximate cause and the defenses of contributory negligence and assumption of risk, all of which may be submitted to the jury by the appropriate and usual instructions.