544 N.W.2d 183 (1996)
1996 SD 10
In the MATTER OF the CERTIFICATION OF QUESTIONS OF LAW FROM the UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT, PURSUANT TO the PROVISIONS OF SDCL 15-24A-1, and concerning federal action.
William KNOWLES and Jane Knowles, on behalf of themselves and as guardians of their minor son, Kris Knowles, Plaintiffs,
v.
UNITED STATES of America, Defendant.
No. 18838.
Supreme Court of South Dakota.
Argued February 14, 1995.
Decided January 31, 1996.
*184 John J. Delaney, Johnson Huffman, P.C., Rapid City, for plaintiffs.
Bonnie P. Ulrich, Craig Peyton Gaumer, Assistant U.S. Attorneys Office, Sioux Falls, for defendant.
Mark Barnett, Attorney General, Sherri Sundem Wald, Assistant Attorney General, *185 Pierre, for Amicus Curiae State of South Dakota.
Timothy M. Engel of May, Adam, Gerdes & Thompson, Pierre, for Amicus Curiae South Dakota State Hospital Association and South Dakota State Medical Association.
[¶ 1] Justice RICHARD W. SABERS delivers the majority opinion of the Court on the result of unconstitutionality of the damages cap of SDCL 21-3-11 based on due process and on questions 3 and 4.
[¶ 2] Justice DAVID GILBERTSON delivers the majority opinion of the Court on the rationale for unconstitutionality and on the revival of the 1985 version of SDCL 21-3-11 and on question 2.
[¶ 3] SABERS, Justice, writing the majority opinion on the result of unconstitutionality of the damages cap of SDCL 21-3-11 based on due process and on questions 3 and 4.
[¶ 4] Parents brought suit for severe injuries suffered by minor son while under care of Air Force hospital. The United States admitted liability and invoked the $1 million cap on medical malpractice damages. The federal district court held the cap was constitutional under the South Dakota and United States Constitutions. On appeal to the Eighth Circuit Court of Appeals, four certified questions were presented and accepted by the South Dakota Supreme Court. For the reasons set forth herein, we hold that the damages cap of SDCL 21-3-11 is unconstitutional.

FACTS
[¶ 5] Kris Knowles was twelve days old when he was admitted for treatment of a fever at the Ellsworth Air Force Base Hospital, near Rapid City, South Dakota. Medical Service Specialists, the Air Force's equivalent to nurses' aides, recorded Kris' temperature. On the night before his discharge, the specialists failed to report to nurses or physicians that Kris' temperature had been dropping throughout that night. Kris developed hypoglycemia and suffered respiratory arrest resulting in severe, permanent brain damage.
[¶ 6] William and Jane Knowles brought suit on their own behalf and for Kris for medical malpractice, emotional distress, and loss of consortium. The United States admitted liability for medical malpractice and filed a motion for entry of judgment of $1 million based on SDCL 21-3-11,[1] which limits damages in medical malpractice actions to $1 million. In Knowles v. U.S., 829 F.Supp. 1147, 1157 (D.S.D.1993), the United States District Court of South Dakota, Western Division, (district court) ruled that SDCL 21-3-11 was constitutional and entered judgment for $1 million. Knowles appealed. The Eighth Circuit Court of Appeals certified four questions to this court, which we accepted:
1. Is the SDCL 21-3-11 damages cap unconstitutional under South Dakota's Constitution? Specifically, is it violative of any of the following portions of the South Dakota Constitution: SDConstArtVI, § 6, the right to a jury trial; SDConstArtVI, §§ 2 and 18, due process and equal protection of law; SDConstArtVI, § 20, the open-courts and remedy-for-injury provision; or SDConstArtIII, § 23(9), forbidding certain special legislation?
2. Are Medical Service Specialists "practitioners of the healing arts" for purposes of SDCL 21-3-11?
The district court answered in the affirmative. Knowles, 829 F.Supp. at 1151.
3. Does South Dakota law recognize emotional distress or loss of consortium for injuries to a minor child as a separate cause of action?
The district court determined that there was only one cause of action for the purpose of its decision. Id. at 1152-53.

*186 4. Does the statutory limitation on damages apply separately to each of the three plaintiffs in this case and each of the two separate causes of action?
The district court answered in the negative. Id. at 1152.
[¶ 7] Question 1: Is the SDCL 21-3-11 damages cap unconstitutional under South Dakota's Constitution?
There is a strong presumption that the laws enacted by the Legislature are constitutional and that presumption is rebutted only when it clearly, palpably and plainly appears that the statute violates a provision of the constitution.
Specht v. City of Sioux Falls, 526 N.W.2d 727, 729 (S.D.1995) (citations omitted). [¶ a)]
Initially, we note that many courts have invalidated limitations on damages based on their respective state constitutions. Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 158 (Ala.1991) (citing Smith v. Dep't. of Ins., 507 So.2d 1080 (Fla.1987) (invalidating a damages cap on personal injury awards); Wright v. Central Du Page Hosp. Ass'n, 63 Ill.2d 313, 347 N.E.2d 736 (1976); Brannigan v. Usitalo, 134 N.H. 50, 587 A.2d 1232 (N.H.1991); Carson v. Maurer, 120 N.H. 925, 424 A.2d 825 (N.H.1980); Arneson v. Olson, 270 N.W.2d 125 (N.D.1978); Morris v. Savoy, 61 Ohio St.3d 684, 576 N.E.2d 765 (1991); Lucas v. United States, 757 S.W.2d 687 (Tex.1988); Condemarin v. Univ. Hosp., 775 P.2d 348 (Utah 1989); Sofie v. Fibreboard Corp., 112 Wash.2d 636, 771 P.2d 711 (1989) (amended by 780 P.2d 260 (Wash.1989)) (invalidating a damages cap on all personal injury actions)).
[¶ 8] Other jurisdictions have upheld a damages cap: Moore, 592 So.2d at 158 (citing Fein v. Permanente Medical Group, 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665 (Calif 1985); Johnson v. St. Vincent Hosp., Inc., 273 Ind. 374, 404 N.E.2d 585 (1980); Samsel v. Wheeler Transport Servs., Inc., 246 Kan. 336, 789 P.2d 541 (1990)) (modified on statutory grounds by Bair v. Peck, 248 Kan. 824, 811 P.2d 1176, 1191 (1991); Etheridge v. Medical Center Hosps., 237 Va. 87, 376 S.E.2d 525 (1989)). See also Carol A. Crocca, Validity, Construction, and Application of State Statutory Provisions Limiting Amount of Recovery in Medical Malpractice Claims, 26 ALR5th 245 (1995); Gary D. Jensen, Legislative Larceny: The Legislature Acts Unconstitutionally When It Arbitrarily Abolishes or Limits Common Law Rights to Redress for Injury, 31 SDLRev 82, 82 (1985) ("Much of the [protectionist legislation for health care providers] has been struck down as unconstitutional.").
[¶ 9] However, the questions presented herein generally turn on the particular constitutional provisions of the state and the case law precedent interpreting those provisions. Because the provisions of the South Dakota Constitution guaranteeing the right to jury trial, open courts and due process are dispositive, we do not reach the other constitutional questions.

SDCL § 21-3-11 violates the right of trial by jury.
South Dakota Constitution article VI, § 6 guarantees the right of trial by jury:
The right of trial by jury shall remain inviolate and shall extend to all cases at law without regard to the amount in controversy[.]
(Emphasis added); see SDCL 15-6-38(a) ("The right of trial by jury ... shall be preserved to the parties inviolate.") (emphasis added). "Inviolate" has been defined as "free from change or blemish: pure, unbroken... free from assault or trespass: untouched, intact[.]" Sofie, 771 P.2d at 721-22 (citing Webster's New Third International Dictionary, 1190 (1976)). In discussing the role of the jury, the United States Supreme Court has stated:
Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.
Dimick v. Schiedt, 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603, 611 (1935) (assessment of damages is a "matter so peculiarly within the province of the jury[.]").
[¶ 10] "A jury is the tribunal provided by law to determine the facts and to fix the amount of damages." Schaffer v. Edward D. Jones & Co., 521 N.W.2d 921, 927 n9 (SD *187 1994) (citation omitted). "[T]he amount of damages to be awarded is a factual issue to be determined by the trier of fact[.]" Sander v. Geib, Elston, Frost Professional Ass'n, 506 N.W.2d 107, 119 (S.D.1993) (citation omitted). With any jury award for personal injuries, we "have allowed [the jury] `wide latitude'" in making its award. Id. (citation omitted).
We are unwilling to allow the trial court authority to limit a damages award as a matter of law ... A jury determination of the amount of damages is the essence of the right to trial by juryto go beyond the procedural mechanisms now in place [remittitur] for reduction of a verdict and to bind the jury's discretion is to deny this constitutional right.
Moore, 592 So.2d at 161 (citation omitted) (emphasis in original). The damages cap is unconstitutional because it limits the jury verdict "automatically and absolutely" which makes the jury's function "less than an advisory status." Id. at 164 (emphasis in original).
[¶ 11] SDCL 21-3-11 arbitrarily and without a hearing imposes a limitation of one million dollars on all damages in all medical malpractice actions. It does so without provisions for determining the extent of the injuries or resulting illness, or whether these injuries or illness resulted in death. It purports to cover even those cases where the medical costs occasioned by the malpractice alone exceed one million dollars. In other words, the damages recovered in these cases could actually be payable to the wrongdoers for medical expenses, not to the victims. It does so in all cases, even when a judicial determination of damages above one million dollars results from an adversarial hearing after notice.
[¶ 12] Five states whose constitutions provide that the right of trial by jury shall remain "inviolate" have invalidated damages caps. Sofie, 771 P.2d at 723 (citing Kansas (see Kansas Malpractice Victims Coalition v. Bell, 243 Kan. 333, 757 P.2d 251 (1988) (modified on statutory grounds by Bair, 811 P.2d at 1191); Texas (Lucas, 757 S.W.2d at 692); Ohio (see Duren v. Suburban Community Hosp., 24 Ohio Misc.2d 25, 495 N.E.2d 51 (1985); and Florida (see Smith, 507 So.2d at 1095)).
[¶ 13] In Sofie, 771 P.2d at 722, the Washington Supreme Court considered whether a personal injury damages cap violated the right of a jury trial. Washington's constitutional provision uses the same language as South Dakota Constitution article VI, § 6. Id. ("The right of trial by jury shall remain inviolate").
For such a right to remain inviolate, it must not diminish over time and must be protected from all assaults to its essential guarantees.... [T]hose guarantees include allowing the jury to determine the amount of damages in a civil case.
Sofie, 771 P.2d at 722 (citation omitted).
[¶ 14] The Kansas Supreme Court considered the former distinctions between equity and legal actions in a challenge to its medical malpractice damages cap. Bell, 757 P.2d at 258 (upholding the validity of a statute which eliminated vicarious liability in medical malpractice actions). In actions for equity which did not request monetary damages, a plaintiff was not entitled to a jury trial. However, in a legal action for money damages, a plaintiff had a right to a jury trial unless waived. Id. A medical malpractice damages cap is "an infringement on the jury's determination of the facts, and, thus, is an infringement on the right to a jury trial." Id. The court concluded that "[i]t would be illogical for this court to find that a jury, empaneled because monetary damages are sought, could not then fully determine the amount of damages suffered." Id.
[¶ 15] In Smith, 507 So.2d at 1088-89, the Florida Supreme Court held that a plaintiff whose personal injury recovery is arbitrarily capped is not "receiving the constitutional benefit of a jury trial[.]" The court held that the recovery cap infringed upon a constitutional right and the legislature may not restrict it merely because it deems it rational. Id. at 1089. The court further held that the legislature must provide a "commensurate benefit" to the tort victim, which it had not. Id.
[¶ 16] For these reasons, we hold that the damages cap violates the right to a jury trial *188 under South Dakota Constitution article VI, § 6.

SDCL 21-3-11 violates SDConstArtVI, § 20, the open courts and remedy-for-injury provision.
[¶ 17] South Dakota Constitution article VI, § 20 requires that the courts remain open and every man for an injury done him "shall have remedy by due course of law, and right and justice, administered without denial or delay." Under SDCL 21-3-11, "practitioners of the healing arts" would be responsible for only a portion of the injuries caused by their negligence when the damages exceed one million dollars. In Bell, 757 P.2d at 263, the Kansas Supreme Court invalidated a damages cap, noting that "the right to a remedy means the right to a full remedy[.]" (emphasis in original). Other courts have also held that the damages cap violates their respective states' open courts provisions. Smith, 507 So.2d at 1088; Lucas, 757 S.W.2d at 692.
[¶ 18] One study found that "there is no relationship between a damage cap and increases in insurance rates thereby reducing available health care, given that less than 0.6% of all claims brought are for over $100,000." Lucas, 757 S.W.2d at 691 (citation omitted). The Lucas court held that the damages cap violated the Texas constitution's open courts provision. Id. at 692.
[¶ 19] In Smith, 507 So.2d at 1088-89, the Florida Supreme Court held that "[a]ccess to courts is granted for the purpose of redressing injuries. A plaintiff who receives a jury verdict for [greater than the cap] has not received a constitutional redress of injuries if the legislature statutorily, and arbitrarily, caps the recovery[.]" In other words, a victim who was hospitalized for life and whose economic damages exceeded the $1 million cap, might receive no compensation for all other damages.[2]
[¶ 20] The general law applicable in this case is SDCL 20-9-1 which provides:
Every person is responsible for injury to the person, property, or rights of another caused by his willful acts or caused by his want of ordinary care or skill, subject in the latter cases to the defense of contributory negligence.
[¶ 21] SDCL 20-9-1 is a simple codification of the common law of negligence. In essence, then, the South Dakota Constitution and existing statutory law provide that an injured person has a right to a remedy against a wrongdoer. Baatz v. Arrow Bar, 426 N.W.2d 298, 304 (S.D.1988) (citing Zacher v. Budd Co., 396 N.W.2d 122 (S.D.1986); Oien v. City of Sioux Falls, 393 N.W.2d 286 (S.D.1986); Daugaard v. Baltic Co-op Bldg. Supply Ass'n, 349 N.W.2d 419 (S.D.1984)). Therefore, under SDCL 20-9-1, and subsequent case law, a person is responsible for injuries caused by his want of ordinary care or skill.
[¶ 22] This court recently addressed the South Dakota "open courts" provision in Kyllo v. Panzer, 535 N.W.2d 896 (S.D.1995). We noted that state law made employees responsible for their torts notwithstanding the protections of sovereign immunity:
Regardless of state employment, Employees still owed the same duty of care to drive safely as any other driver not so employed. Employees' claimed immunization from suit does not extend to negligent individuals in any other sector of employment. The legislature cannot extend it to negligent individuals who work for the state.
Kyllo, 535 N.W.2d at 903.
[¶ 23] Knowles' situation is similar to those injured by negligent state employees who would have been immune from lawsuits if the statute were constitutional. Physicians owe a duty of care to patients in their positions as health care providers.
[¶ 24] SDCL 20-9-1 makes each person liable for damage to others in tort without *189 limitation on the amount of the injury. SDCL 21-3-11 attempts to carve a special exception for practitioners of the healing arts. While the legislature has the power and ability to make the laws of the state, "[t]he function of this court is to interpret the laws as they affect the `life, liberty, or property of the citizens of the State.'" Kyllo, 535 N.W.2d at 901 (quoting Baatz, 426 N.W.2d at 303). The legislature does not act alone. This court exists to ensure that the constitutional rights of citizens are not infringed upon by acts of the legislature. It is not enough to say the legislature has the right to limit remedies; those restrictions must also be constitutional. "Although the legislature has the authority to limit available remedies, especially when they purport to reach state coffers, it is our responsibility to ensure access to the courts as guaranteed by our state constitution." Kyllo, 535 N.W.2d at 901.
[¶ 25] "The legislature can impose reasonable restrictions upon available remedies and even upon these rights in accordance with the constitution, as long as they do not violate the constitution; but they cannot destroy these rights in violation of the constitution." Baatz, 426 N.W.2d at 304 (emphasis added). For these reasons, we hold that SDCL 21-3-11 violates South Dakota's open courts provision, SDConstArtVI, § 20.[3]

SDCL 21-3-11 violates due process.
[¶ 26] Under South Dakota Constitution article VI, § 2, "[n]o person shall be deprived of life, liberty or property without due process of law." People have a right to be free from injury. Swanson v. Ball, 67 S.D. 161, 290 N.W. 482 (1940). We apply a more stringent test than the federal courts' rational basis test. Katz v. Bd. of Med. & Osteopathic Examiners, 432 N.W.2d 274, 278 n.6 (SD 1988). The statute must "bear a real and substantial relation to the objects sought to be attained." Id. (citation omitted).
[¶ 27] Ohio uses the same test. In Morris, 576 N.E.2d at 770-71, the Supreme Court of Ohio held that a medical malpractice damages cap was a violation of due process. A 1987 study by the Insurance Service Organization, which sets the rates of the insurance industry, found that the savings from various tort reforms including a damages cap were "marginal to nonexistent." Id. 576 N.E.2d at 771. The court concluded that the cap was irrational and arbitrary and that it did "not bear a real and substantial relation to public health or welfare[.]" Id.
[¶ 28] In Arneson, 270 N.W.2d at 136, the North Dakota Supreme Court examined whether a medical malpractice damages cap violated equal protection and due process under the North Dakota constitution:
Defendants argue that there is a societal quid pro quo in that the loss of recovery potential to some malpractice victims is offset by "lower insurance premiums and lower medical care costs for all recipients of medical care." This quid pro quo does not extend to the seriously injured medical malpractice victim and does not serve to bring the limited recovery provision within the rationale of the cases upholding the constitutionality of the Workmen's Compensation Act.
Id. (quoting Wright, 347 N.E.2d at 742). See Carson, 424 A.2d at 837-38 (quoting same passage from Wright, 347 N.E.2d at 742) (invalidating a damages cap based on equal protection because no quid pro quo was given).[4] The North Dakota Supreme Court held that the damages cap violated equal protection and due process.[5]Arneson, 270 N.W.2d at 135-36. In Lyons v. Lederle Laboratories, *190 440 N.W.2d 769, 771 (S.D.1989), we discussed equal protection rather than due process and stated: "We fail to perceive any rational basis for assuming that medical malpractice claims will diminish simply by requiring that suits be instituted at an earlier date." The statute of limitations in Lyons, which carved out an exception for minors which did not allow tolling, created an arbitrary classification of those minors with medical malpractice claims versus other tort claims. Id. Likewise, SDCL 21-3-11 creates arbitrary classifications of medical malpractice claimants and of those claimants who sustain damages over $1 million and those who do not. Those who suffer less than $1 million in damages may be compensated fully while those who suffer more shall have their damages capped.
[¶ 29] The arbitrary classification of malpractice claimants based on the amount of damages is not rationally related to the stated purpose of curbing medical malpractice claims. See Lyons, 440 N.W.2d at 773 (Sabers, J. concurring specially). The legislation was adopted as a result of "some perceived malpractice crisis." Id. at 771. Many courts and commentators have argued that there was no "crisis" at all.[6] Gail Eiesland, note, Miller v. Gilmore: The Constitutionality of South Dakota's Medical Malpractice Statute of Limitations, 38 SDLRev 672, 703 (1993); Hoem v. State, 756 P.2d 780, 783 (Wyo.1988) (holding that medical malpractice tort reform violated equal protection under the rational basis standard). As noted by the court in Hoem:
It cannot seriously be contended that the extension of special benefits to the medical profession and the imposition of an additional hurdle in the path of medical malpractice victims relate to the protection of the public health.
756 P.2d at 783.
[¶ 30] In Moore, 592 So.2d at 167-169, the court examined several studies to conclude that the connection between recovery caps *191 and decreased malpractice insurance rates was "at best, indirect and remote." Id. at 168. The court balanced this remote connection against the "direct and concrete" burden on severely injured claimants. Id. at 169; see Carson, 424 A.2d at 837 (It is "unfair and unreasonable to impose the burden of supporting the medical care industry solely upon those persons who are most severely injured and therefore most in need of compensation."). "[T]he statute operates to the advantage not only of negligent health care providers over other tortfeasors, but of those health care providers who are most irresponsible." Moore, 592 So.2d at 169 (emphasis in original).
[¶ 31] Before SDCL 21-3-11 was amended in 1986, the statute only capped general or noneconomic damages.[7] Now, the $1 million cap applies to all damages, noneconomic and economic. 1986 SDSessLaws ch 172. This record provides no reasons for amending the statute or making the cap apply to all damages. Therefore, even if the legislative record and findings were sufficient to support the existence of an insurance crisis and the reasonableness of the cap on noneconomic damages at $500,000, they would not support the reasonableness of placing a cap on all damages, economic and noneconomic, at $1 million. No justifiable reason appears to cap economic damages.[8]
[¶ 32] SDCL 21-3-11 does not treat each medical malpractice claimant uniformly. It divides claimants into two classes: those whose damages are less than $1 million and those whose damages exceed $1 million. Those who have awards below the statutory cap shall be fully compensated for their injury while those exceeding the cap are not.
[¶ 33] Therefore, SDCL 21-3-11 does not bear a "real and substantial relation to the objects sought to be obtained" and we hold that the damages cap violates due process guaranteed by South Dakota Constitution article VI, § 2.

CONCLUSION
[¶ 34] In this instance, if we assume that the economic damages are $2 million and the noneconomic damages are $1 million, it becomes clear that the statute is neither reasonable nor constitutional. The reasons are many, but the most basic is that the statute impermissibly gives all the benefits to the wrongdoer (his liability is limited to $1 million) while it places all the corresponding detriment on the negligently injured victim (his recovery, economic & noneconomic, is limited to $1 million). There is no quid pro quo or "commensurate benefit" here. Smith, 507 So.2d at 1089; see Arneson, 270 N.W.2d at 136; Wright, 347 N.E.2d at 742; Carson, 424 A.2d at 838; Jensen, supra, at 104. [¶ a)]
Despite a claimed medical malpractice crisis in the rural areas of this state, this legislation wholly failed to differentiate between rural and urban problems and solutions. It purported to cover all practitioners of the healing arts, including chiropractors and dentists. There is no showing of a shortage of chiropractors or dentists. The statutes purported to cover the entire state even though there was no medical malpractice crisis in the urban areas such as Minnehaha and Pennington Counties, as opposed to the rural areas.
[¶ 35] Even in this case, we are dealing with a United States Air Force hospital situated in Pennington County. There is no showing that any United States Air Force *192 hospital had any difficulty obtaining and keeping practitioners of the healing arts. This legislation does not bear a real and substantial relation to the objects sought to be attained[9] and it violates many rights in the process. The fact that certain fringe benefits may result to the public in general is insufficient to save this statute. The same rationale applies to prior versions of the statute. Therefore, they violate the constitutional provisions stated herein.
[¶ 36] We are not saying that the state cannot subsidize health practitioners or even the health insurance industry. We are simply saying that it cannot be done in this manner to the sole detriment of the injured. Obviously, fewer constitutional objections would exist if the state would pay the difference to the injured; or, before the fact, to the insurer or health care provider; or, in all personal injury actions, all damages, economic and noneconomic, were limited in reasonable proportions for all those wrongfully injured for the benefit of all wrongdoers. We decline to comment on the wisdom, as opposed to the constitutionality of such approach.
[¶ 37] Question 2: Are Medical Service Specialists "practitioners of the healing arts" for purposes of SDCL 21-3-11?
[¶ 38] In view of our holding that the damages cap of SDCL 21-3-11 is unconstitutional, it is not necessary to reach this question. Alternatively, the question would be moot upon the revival of the 1985 version of SDCL 21-3-11 because this particular language was not added until the 1986 amendment.
[¶ 39] Question 3: Does South Dakota law recognize emotional distress or loss of consortium for injuries to a minor child as a separate cause of action?
[¶ 40] We have held that a parent may bring a cause of action to recover consequential damages incurred because of negligent injury to a child. Barger for Wares v. Cox, 372 N.W.2d 161, 164 (S.D.1985). Furthermore, a parent may bring a cause of action for loss of companionship and society of a child under our wrongful death statute. Anderson v. Lale, 88 S.D. 111, 216 N.W.2d 152, 158-59 (S.D.1974). We have never recognized a loss of consortium claim, however, on behalf of a parent because of injuries to a child.
[¶ 41] Analogous to our rationale is the relationship between a husband and wife in comparison to a parent and child. In Barger, we cited with approval the language of Callies v. Reliance Laundry Co., 188 Wis. 376, 206 N.W. 198, 200 (1925), where it was stated:
The parent is by law required to support and care for his child. In return for the performance of such obligation, the law gives to the parent the right to a part of the child's cause of action in case he is negligently injured by another. So also since the husband is required to support his wife the law likewise gives him a part of the wife's cause of action in case she is negligently injured by another. This splitting up of the cause of action resulting in some of the damages being given the child and some to the parent, or some to the wife and some to the husband, is due solely to the parental and marital relations existing between the parties.... But for such relations and obligations the entire damages would belong to the child or wife[.]
Barger, 372 N.W.2d at 165.
[¶ 42] We have recognized a spouse's right to claim loss of consortium when the other spouse is injured because of the negligent acts of another. Hoekstra v. Helgeland, 78 S.D. 82, 98 N.W.2d 669, 681 (S.D.1959). The Hoekstra court examined the common law to determine whether a wife had a right to maintain an action for loss of consortium. Id. 98 N.W.2d at 670-79. Therefore, we also look to the common law to see if a parent has a similar right. We do not find that a parent had or has a common law right to make a claim of loss of consortium. Prosser summarizes the common law rights of parents regarding injuries to their child:

*193 Since the father was, under the common law rule, entitled to the services of his child, he was entitled to recover for a loss of services or earning capacity not only when the child was enticed away or seduced, but also when the child was tortiously injured. And since the father was obliged to provide medical attention to the child, he was likewise entitled to recover against the tortfeasor for the child's medical expenses. But the claim for the loss of the child's services did not expand to include intangible losses of consortium as it did when a spouse was injured: where the child was negligently injured the parent had no claim for loss of the child's society and companionship except so far as the claim for loss of services in a modern society is a fictional one.
A partial exception to this rule developed under the wrongful death statutes in some states, where loss of the child's society, companionship or affection may be a recoverable item of damages for surviving parents[.]
Prosser and Keeton on The Law of Torts § 125, at 934 (5th ed 1984)(footnotes omitted)(emphasis added).
[¶ 43] Therefore, we answer the third certified question in the negative as we do not recognize a parent's emotional distress or loss of consortium claim for injuries to a minor child. We do, however, recognize a parent's right to assert claims for loss of the child's services and for medical and other consequential damages incurred in caring for the child.
[¶ 44] Question 4: Does the statutory limitation on damages apply separately to each of the three plaintiffs in this case and each of the two separate causes of action?
[¶ 45] SDCL 21-3-11 states in pertinent part: "In any action for damages for personal injury or death alleging malpractice ... the total damages which may be awarded may not exceed the sum of one million dollars." We have previously held this statute applies separately to a cause of action for personal injury and to a cause of action for wrongful death. Sander, 506 N.W.2d at 126-27. Therefore, the two causes of action in Sander were subject to separate $1 million caps. Id. at 126.
[¶ 46] Two separate causes of action have been presented by the plaintiffs in this case. The first cause of action is premises liability and the second is professional negligence. In Sander, the causes of action were different in the remedies sought, the recipients of any damages awarded, and the distributions of any damage awards. Id. at 127. Here, the facts, liability and damages asserted under either theory are the same. Thus, premises liability and professional negligence are not distinguishable "actions" for purposes of SDCL 21-3-11, and these two causes of action would be subject to one damage cap.
[¶ 47] The more difficult question is whether the child's cause of action and the parents' derivative action are separate "actions" for purposes of the damages cap. We have classified a spouse's cause of action for loss of consortium as derivative in nature, even though the right of consortium is a personal right and a separate and distinct cause of action. Titze v. Miller, 337 N.W.2d 176, 177 (S.D.1983). If the injured child is unable to recover for his own personal injuries, the parents' cause of action would also fail. Barger, 372 N.W.2d at 165. Their cause of action for consequential damages for negligent injury to a child, is derivative of the child's and is not recognized as a separate cause of action. Id. at 164. The parents' action is derivative in the sense that parents cannot recover unless the child also has a good cause of action. Id. Hence, the parents' cause of action is derivative of the child's in regard to the issue of liability and parents are subject to the defenses which could be used against the child to refute liability. See Id. at 164-165.
[¶ 48] There can be two "actions" for one wrongful act. Sander, 506 N.W.2d 107; Rowe v. Richards, 35 S.D. 201, 214-18, 151 N.W. 1001, 1006-07 (1915). The Rowe court stated, "where there are two rights violated, the wrongs are separate and distinct. Of course, it is a recovery of two items of damages resulting from one wrongful act, but it is not the recovery of two items of damage *194 for one injury." Rowe, 151 N.W. at 1007 (emphasis in original). In Sander we found the plaintiffs in the two causes of action were distinct. Sander, 506 N.W.2d at 127. The remedies sought, the recipients of any damages awarded, and the distributions of any damage awards distinguish the causes of action. Sander, 506 N.W.2d at 127. Similarly, the parents' claim in this case is distinct. The parents are legally obligated to provide support and maintenance, including expenses reasonable and necessarily incurred in curing the child's injury. Doyen v. Lamb, 75 S.D. 77, 80-82, 59 N.W.2d 550, 552-53 (1953). The parents' damages are not for the injury done to the child, but for the injury done to the parents for loss of services during the minority and expenses incurred by the parents as a result of the injuries. Barger, 372 N.W.2d at 165; Doyen, 59 N.W.2d at 553. In Barger, we cited with approval the language used in Shiels v. Audette, 119 Conn. 75, 174 A. 323, 325 (1934):
An act or omission of a person which causes a loss of the services of a minor child to a parent, or necessitates expenditures to cure an injury done to the child, entitles the parent to recover damages when it appears that the act or omission is one which the law holds to be a legal wrong ... In such a case as this, where the basis of the claimed wrongful conduct is the failure of the defendant to take certain steps to prevent the child from suffering injury, the parent cannot recover unless that failure constituted a legal wrong to the child.
Barger, 372 N.W.2d at 165. The child's damages are significantly different from the parents, and may be in the form of pain and suffering or mental anguish from the physical injury itself. See Id. This is not a double recovery of damages and the jury can apportion the damages among the injured parties. Rowe, 35 S.D. at 216-18, 151 N.W. at 1007. We can also avoid a multiplicity of suits by uniting the suits into one. Doyen, 75 S.D. at 82, 59 N.W.2d at 553.
[¶ 49] We have found a parent's cause of action for consequential damages resulting from the negligent injury to a child, while derivative, is a personal right. See Barger, 372 N.W.2d at 164-65. Furthermore, we have stated, "the prevailing rule is that the term [personal injury], when used in a statutory context, should be interpreted broadly to include injuries to personal rights." Titze, 337 N.W.2d at 177. SDCL 21-3-11 uses the terminology "personal injury" and thus encompasses the parents' personal right to recover for their damages.
[¶ 50] Due to the differing nature of the parents' damages claim in comparison to the child's, we find the parents' claim is a distinct "action" as applied to SDCL 21-3-11. However, the actions are linked in regard to liability issues and the parents cannot recover unless the child also has a good cause of action. Because SDCL 21-3-11 is a limitation on damages only, not liability, we hold the parents' "action" and the child's "action" are separate and distinct for purposes of the damage cap. Therefore, we have one "action" regarding liability, but separate "actions" in relation to damages.
[¶ 51] Certified questions answered.
[¶ 52] AMUNDSON, J., concurs specially.
[¶ 53] MILLER, C.J., and KONENKAMP and GILBERTSON, JJ., concur in part, concur in result in part and dissent in part.
AMUNDSON, Justice (concurring specially).
[¶ 54] I concur that the 1986 cap is unconstitutional and the most solid ground for such a holding is that it violates due process. There is no rational, logical, or commonsense reason for establishing the arbitrary classification of medical malpractice victims into those who receive 100% of their recovery because their damages are one million dollars or less, whereas the more seriously injured who incur damages in excess of one million will receive only a percentage of their damage award. The legislative history for the 1986 enactment is totally inadequate to support a holding that the legislature was acting prudently to a crisis in 1986 compared to the enactment and legislative history of the 1976 cap. Further, since this legislation is unconstitutional for this reason, I see no need to kill the bird more than once and would not *195 reach the other grounds raised in contending the legislation was unconstitutional.
[¶ 55] Finally, I concur with Justice Sabers' response to the other questions certified.
[¶ 56] GILBERTSON, Justice, writing the majority opinion on the rationale for unconstitutionality and on the revival of the 1985 version of SDCL 21-3-11 and on question 2.

INTRODUCTION AND BACKGROUND
[¶ 57] I agree with the writing of Justice Sabers only insofar as it holds our cap violates substantive due process. This cap requires the most seriously injured malpractice victims to bear the burden of alleviating a perceived medical malpractice insurance crisis by limiting recovery for actual economic losses.
[¶ 58] However, I cannot join the disapproval of SDCL 21-3-11 as unconstitutional on the other questions it addresses. Rarely will a statute offend multiple constitutional provisions, especially when we acknowledge, as we must, that "[t]here is a strong presumption in favor of the constitutionality of a statute, and this presumption is only rebutted when it appears clearly, palpably and plainly that the statute violates some provision of the state constitution." Simpson v. Tobin, 367 N.W.2d 757, 765 (S.D.1985)(emphasis added). The writing of Justice Sabers affronts this presumption with analysis so cathartic that no futureand perhaps no pastlimitation on lawsuit remedies in South Dakota can ever survive.
[¶ 59] South Dakota was not alone in adopting a damages cap to deal with the perceived problem of rampant medical malpractice damage awards.[10] In the last twenty years many courts have examined whether malpractice caps violate their state constitutions.[11] I find it of little assistance that a substantial minority of states addressing the issues of the constitutionality of caps on medical recovery have struck them down. The medical cap statutes vary, the state constitutions vary, the courts' rationales vary, and the decisions are well-peppered with strong dissents. These facts alone should move us to ponder whether their various legal resolutions truly reflect pure constitutional interpretation. In matters of economics and social welfare, courts must defer to our democratically elected representatives unless their enactments patently conflict with some constitutional provision. Ferguson v. Skrupa, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963). If SDCL 21-3-11 is to be found unconstitutional, it can only be struck down based on its legislative history and our prior case law interpreting our constitution.
[¶ 60] It is vitally important to an analysis of this issue to understand and respect the circumstances under which South Dakota enacted SDCL 21-3-11. In the mid-1970s, our Legislature, along with many legislatures throughout the country, became gravely concerned *196 about the availability and cost of health care, especially in rural areas and small communities. Seeing a direct correlation between the availability of health services and skyrocketing medical malpractice insurance premiums, these state legislatures attempted to alleviate the increasing cost of such insurance by enacting statutes limiting the damages recoverable in medical malpractice suits.[12]
[¶ 61] South Dakota's Legislature prudently responded to this perceived crisis by first setting up a special fact-finding committee to study the problem.[13] After considering public testimony taken over a period of months,[14] the Legislature responded with a $500,000 cap on general (noneconomic) damages for medical malpractice awards for a period of ten years. The 1976 statute provided:
In any action for damages for personal injury or death alleging malpractice against any physician, dentist, hospital, sanitorium, registered nurse or licensed practical nurse under the laws of this state, whether taken through the court system or by binding arbitration, the total general damages which may be awarded shall not exceed the sum of five hundred thousand dollars. No limitation is placed on the amount of special damages which may be awarded. This section shall apply only to causes of action arising from injuries or death occurring between July 1, 1976 and June 30, 1986[.]
[¶ 62] All things considered, the Legislature acted sensibly to meet a perceived crisis. Our elected representatives reasoned a cap on damages would lead to greater ease in calculating premiums, thus making the market more attractive to insurers, which could ultimately lead to reduced premiums, making insurance more affordable for individuals and organizations providing vital health services.
[¶ 63] South Dakota faced unique problems in 1976. It had one of the worst doctor-patient ratios in the nation, with only five hundred doctors in the entire State. Availability and affordability of malpractice insurance, especially for solo practitioners in rural areas, was deemed essential to ensure an adequate number of doctors and other health care providers to serve the medical needs of South Dakota citizens.[15]
*197 [¶ 64] An unsettled argument persists over whether a malpractice crisis ever actually existed.[16] Yet there can be no doubt, for whatever reason, malpractice premiums were increasing at an alarming rate. Umbrella coverage for a general or family practitioner in South Dakota rose from a rate of $640 a year in 1970 to approximately $8,400 a year in 1976. The problem was especially acute in rural areas. The issue was cast as potentially a life-or-death situation for persons needing that care where its future availability was in doubt. Robert Johnson, Executive Secretary of the South Dakota Medical Association told the special committee "we can't get insurance for solo practitioners. We're the only state that I know of with the problem."
[¶ 65] South Dakota's hospitals faced similar increases: St. Luke's Hospital in Aberdeen paid $4,060 for $10,000,000 in coverage in 1974; only three years later it paid $75,742 for $2,000,000 in coverage. In Mitchell, St. Joseph's Hospital paid $3,008 for $10,000,000 coverage in 1974 and $40,420 for $2,000,000 coverage in 1977. Unable to afford the premiums during this time, two hospitals in South Dakota went without coverage altogether. In the end, whatever the cost, South Dakota citizens would bear the burden; either through higher medical bills and health insurance premiums; or by not having medical services available because doctors and other providers could not afford to obtain insurance.
[¶ 66] Perhaps this predicament has been partially ameliorated today. Nonetheless, we are not legislative overlords empowered to eliminate laws whenever we surmise they are no longer relevant or necessary. The law has long recognized that a determination of economic policy and the duration of that policy remains within the purview of the Legislature. Behrns v. Burke, 89 S.D. 96, 103, 229 N.W.2d 86, 90 (1975); Adams, 832 S.W.2d at 904; Strykowski, 261 N.W.2d at 442. In addition, the Legislature is free to not only act on an existing medical crisis, it also has the authority to address a problem to avoid a medical crisis before it develops. Knowles v. US, 829 F.Supp. 1147, 1154 (D.S.D.1993) aff'd in part, 29 F.3d 1261 (8thCir.1994). South Dakota's interest in preserving and promoting adequate, available and affordable medical care for its citizens was a legitimate legislative objective which should not be thwarted by judicial intrusion. We owe deference to "the peoples' right to govern themselves;" it is not our privilege to "supervise that process." Indep. Community Bankers Ass'n. of SD v. State By and Through Meierhenry, 346 N.W.2d 737, 745 (SD 1984).
[¶ 67] Quoting studies from other states, the writing of Justice Sabers appears to take issue with our Legislature's findings in 1976. I repudiate this as judicial encroachment.
Where the constitutional validity of a statute depends upon the existence of facts, courts must be cautious about reaching a conclusion respecting them contrary to that reached by the legislature; and if the question of what the facts establish be a fairly debatable one, it is not permissible for the judge to set up his opinion in respect of it against the opinion of the lawmaker.
Radice v. New York, 264 U.S. 292, 294, 44 S.Ct. 325, 326, 68 L.Ed. 690, 694 (1924). The Legislature clearly had a factual basis and the authority for making its determinations concerning the existence and nature of the crisis. By instituting a cap, the Legislature reasoned that limiting the exposure of an individual defendant would reduce an insurance carrier's financial responsibility and serve to limit malpractice insurance premiums. Obviously, whatever the cost, it would be passed on to consumers. The Legislature reasonably believed a cap on malpractice damages would help stabilize malpractice insurance premiums. There is some evidence the statute has achieved its intended effect.[17] *198 After the enactment of the cap in 1976, South Dakota's primary malpractice insurer, St. Paul Insurance Companies, moderated its dramatic rate increases and became more amenable to insuring new risks in the medical profession. Our State has a legitimate interest in promoting the health, comfort, safety, and welfare of all its citizens.
[¶ 68] Unfortunately we are not reviewing the 1976 enactment. In 1986 the Legislature amended SDCL 21-3-11 which now provides:
In any action for damages for personal injury or death alleging malpractice against any physician, chiropractor, dentist, hospital, registered nurse, certified registered nurse anesthetist, licensed practical nurse or other practitioner of the healing arts under the law of this state, whether taken through the court system or by binding arbitration, the total damages which may be awarded may not exceed the sum of one million dollars.
While most other jurisdictions where malpractice caps had been upheld adhered to capping only noneconomic damages, the South Dakota Legislature for reasons unknown adopted a flat cap on "total damages." This caps not only noneconomic damages as in 1976, but also caps actual out-of-pocket expenses and future losses. Therefore, in 1986, the distinction between economic and noneconomic damages disappeared from the statute.
[¶ 69] Crucial to an analysis of the 1986 statute and the constitutional status of tort damages and remedies is our acknowledgment that in this state, there exists no constitutional distinction between economic and non-economic damages.[18] As to both, the Legislature possesses broad authority to *199 modify the scope and nature of any tort remedy. It can "change the remedy or the form of procedure, attach conditions precedent to its exercise (or) perhaps abolish and substitute new remedies, it cannot deny a remedy entirely." Kyllo, 535 N.W.2d at 901 (citing Mattson v. City of Astoria, 39 Or. 577, 65 P. 1066, 1067 (1901)). There is nothing new about this doctrine as Kyllo traces its lineage back to McClain v. Williams, 10 S.D. 332, 73 N.W. 72 (1897).
[¶ 70] With this background in mind, we proceed to examine the certified questions before us.

ANALYSIS
[¶ 71] 1. Is the SDCL 21-3-11 damages cap unconstitutional under South Dakota's Constitution? Specifically, is it violative of any of the following portions of the South Dakota Constitution: SD Const. Art. VI, § 6, the right to a jury trial; SD Const. Art. VI, §§ 2 and 18, due process and equal protection of the law; SD Const. Art. VI, § 20, the open-courts and remedy-for-injury provision; of SD Const. Art. III, § 23(9), forbidding certain special legislation?
[¶ 72] We need only answer the question on due process, as that issue adequately disposes of the Eighth Circuit's inquiry, but because the writing of Justice Sabers also finds the statute unconstitutional on other grounds, I write to disagree on those points.

Due Process

ArtVI § 2: No person shall be deprived of life, liberty or property without due process of law.
[¶ 73] A. Substantive Due Process. Although I cannot endorse its broad rationale, I agree the writing of Justice Sabers has valid cause for declaring the statute unconstitutional under a substantive due process analysis.[19] South Dakota historically has applied a more stringent standard than the United States Supreme Court's substantive due process analysis.[20] Our constitutional test requires the statute "bear a real and substantial relation to the object sought to be obtained," which cannot be unreasonable, arbitrary or capricious. Katz v. Bd. of Medical & Osteopathic Examiners, 432 N.W.2d 274, 278 n6 (SD 1988); Crowley, 268 N.W.2d at 619; Nuss, 114 N.W.2d at 636. Under this test, therefore, we first determine whether South Dakota's flat medical malpractice cap bears a "real and substantial relation" to its stated purpose: limiting insurance premiums to make health care more affordable to South Dakotans. Katz, 432 N.W.2d at 278 n6. Certainly, the cap's goal substantially tends to accomplish this end. When total damages are limited to a fixed amount, logically insurance *200 rates ought likewise to stabilize. So the essential question is whether this cap is unreasonable, arbitrary or capricious in accomplishing the legislative purpose.
[¶ 74] At the outset, we must acknowledge that nothing in South Dakota's Constitution suggests a plaintiff in a tort action has a fundamental right to an unlimited monetary remedy.[21] The Legislature possesses broad authority to modify the scope and nature of any remedy. Kyllo, 535 N.W.2d at 901; see also Fein, 211 Cal.Rptr. 368, 695 P.2d at 679; American Bank & Trust Co. v. Community Hospital, 36 Cal.3d 359, 204 Cal.Rptr. 671, 683 P.2d 670, 676 (1984); Scholz, 851 P.2d at 907. Certainly the 1976 version sought only to cut the fat out of malpractice awards. Medical bills, lost wages, and prescription costs are tangible damages, whereas pain and suffering and like damages are largely intangible. Unbridled noneconomic damage awards present a real threat to maintaining reasonable malpractice insurance premiums, because such awards are unpredictable and based on highly subjective perceptions. See Fein, 211 Cal.Rptr. 368, 695 P.2d at 680-81.[22] In truth, however, the 1986 flat cap on total damages potentially cuts not only fat, but muscle, bone and marrow. If a malpractice patient's hospital bill, for example, exceeds the cap, then the patient can recover nothing for the remaining medical bills, future bills, past and future income lost, prescriptions, etc.[23] The 1976 enactment did not have this problem.
[¶ 75] When the Legislature imposed the $1 million cap, it acted without any showing of need. Out of the hundreds of pages of the record concerning a medical crisis of the mid-1970's in this state, there is not any evidence in the record which shows that in 1986 the "crisis" had worsened to require a cap on economic damages. In fact the only *201 post-1976 evidence in the record points to the contrary. In 1985, only one year prior to the inclusion of economic damages in SDCL 21-3-11, the Legislature was pleased enough with the effect of the 1976 version of the statute that the Legislature, by amendment, removed the ten-year expiration date on the 1976 statute thereby making it a permanent law. 1985 SD SessLch 167. Notwithstanding all the evidence considered in 1976 to support the cap on noneconomic damages, the 1986 amendment encompassed all damages. Under appropriate circumstances such a cap may have been warranted, but without adequate justification, its adoption was plainly an unreasonable and arbitrary imposition of an economic burden upon the most severely injured malpractice victims.
[¶ 76] As noted above, there is no constitutional basis for any differentiation in the treatment of economic damages and non-economic damages in this state. In 1976, 1978,[24] 1985 and 1986, the Legislature determined that the effect of the medical crisis mandated a cap on non-economic damages. There is a real and substantial basis to find that the statute satisfies the legitimate state interest of controlling the costs of non-economic damages addressed by the 1976 act. However, based on the state of the record, no such real and substantial basis exists to cap economic damages in 1986 when in 1976, 1978, and 1985, the Legislature found such action unnecessary.[25]
[¶ 77] The result reached by this analysis is consistent with our prior holding in Lyons, 440 N.W.2d 769, wherein we struck down a statute of limitations pertaining to minors on the grounds that it violated the equal protection clause of our State Constitution. Lyons is helpful on two points. First, Lyons accepts the premise that the Legislature had the constitutional right to act to deal with the "perceived" medical crisis that arose in the 1970's. Second, the Lyons Court held that any such action must be directly related to the identified problem it seeks to correct. Applying a lower standard of review under equal protection analysis (the rational basis test) than we apply today under due process analysis (the real and substantial relation test), the Court in Lyons struck down the statute of limitations on minors, holding there was no rational basis to assume that medical malpractice claims would diminish simply by requiring that legal action be instituted at an earlier date.
[¶ 78] Based on the analysis as set forth above, I would find the cap on economic damages of SDCL 21-3-11 to be in violation of the substantive due process clause of the South Dakota Constitution. I would find the cap on non-economic damages to be constitutional for the reasons previously set forth.
[¶ 79] B. Procedural Due Process. Malpractice plaintiffs' procedural due process rights are not violated, as they continue to have the opportunity to be heard in court at a meaningful time and in a meaningful manner. Boddie v. Connecticut, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113, 119 (1971); Daugaard, 349 N.W.2d at 424; Strykowski, 261 N.W.2d at 444. Constitutional guarantees of due process apply to rights, not remedies. Gibbes v. Zimmerman, 290 U.S. 326, 332, 54 S.Ct. 140, 142, 78 L.Ed. 342, 347 (1933); Scholz, 851 P.2d at 907. Due process is flexible and requires only such procedural protections as the particular situation demands. Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 33 (1976); Flockhart v. Wyant, 467 N.W.2d 473, 476 (S.D.1991). "[I]t has been clear that the constitutionality of measures affecting such economic rights under the due process clause does not depend on a judicial assessment of the justifications for the legislation or of the wisdom or fairness of the enactment." Fein, 211 Cal.Rptr. 368, 695 P.2d at 679 (citing American Bank, 683 P.2d 670, 204 Cal.Rptr. 671).

*202 Right to Jury Trial

ArtVI § 6: The right of trial by jury shall remain inviolate and shall extend to all cases at law without regard to the amount in controversy[.]
[¶ 80] The right to a jury trial guarantees juries will function as fact finders on liability and the amount of damages, but this does not deprive the Legislature of its power to limit remedies. The assessment of civil damages is not one of the fundamental elements preserved by the common law right to a jury trial. Tull v. United States, 481 U.S. 412, 426, 107 S.Ct. 1831, 1840, 95 L.Ed.2d 365, 379 (1987); Adams, 832 S.W.2d at 907. In addressing the scope of the right to trial by jury under the Seventh Amendment to the United States Constitution, Tull held liability under the Clean Water Act could only be determined by a jury, but there is no constitutionally protected right to a jury determination of damages in the event liability is imposed. Tull, 481 U.S. at 426-27, 107 S.Ct. at 1840, 95 L.Ed.2d at 379. See Samsel v. Wheeler Transport Servs., 246 Kan. 336, 789 P.2d 541, 551 (1990). Furthermore, the common law never recognized a right to full recovery in tort. Duke Power Co., 438 U.S. at 88-89, 98 S.Ct. at 2638, 57 L.Ed.2d at 620-21. "A remedy is a matter of law, not a matter of fact." Etheridge v. Medical Center Hosps., 237 Va. 87, 376 S.E.2d 525, 529 (1989); Robinson, 414 S.E.2d at 888. "A trial court applies the remedy's limitation only after the jury has fulfilled its fact-finding function." Etheridge, 376 S.E.2d at 529 (emphasis in original). Once a jury assesses liability and determines damages, it has completed its constitutional function. Adams, 832 S.W.2d at 907; Etheridge, 376 S.E.2d at 529. Our statute does not withdraw the fixing of damages, because only after the jury finds damages and only if the cap is exceeded, will the damage cap be imposed. Johnson, 404 N.E.2d at 602. A successful plaintiff "has no right to have a jury dictate through an award the legal consequences of its assessment." Etheridge, 376 S.E.2d at 529. The Legislature merely sets the outer limits of the remedy. Wright v. Colleton County School Dist., 301 S.C. 282, 391 S.E.2d 564, 569 (S.C.1990); Etheridge, 376 S.E.2d at 529.
[¶ 81] The right to a jury trial has always been subject to limits. A valid claim may be entirely denied through failure to bring an action before expiration of a statute of limitations. SDCL ch. 15-2. Or such right may be precluded by failure to follow statutory procedures. SDCL 15-6-38(d). Juries must follow the court's instructions. SDCL 15-14-11. Awards resulting from passion and prejudice will not stand. Maybee v. Jacobs Motor Co., Inc., 519 N.W.2d 341, 344 (S.D.1994). Causes of action are also subject to summary judgment, directed verdicts, and judgments notwithstanding the verdict. A jury's award can be reduced by remittitur or increased under a treble damages statute. Only in criminal trial acquittals is a jury's verdict final.[26]
[¶ 82] Nothing in our Constitution suggests the right to a jury trial extends to making its damages award inviolate. The *203 right to a jury trial ensures that the civil jury itself will not be abolished; the right does not extend the jury's function to the remedy phase of a civil trial. Tull, 481 U.S. at 426 n. 9, 107 S.Ct. at 1840 n. 9, 95 L.Ed.2d at 378 n. 9. Once a jury has rendered its decision on damages, it has fulfilled its duty. The jury cannot mandate compensation as a matter of law. Boyd, 877 F.2d at 1196. Our Legislature retains the power to change a remedy or abolish it and substitute a new remedy, so long as it does not deny a remedy. Kyllo, 535 N.W.2d at 901. The damages cap does not violate the right to a jury trial.

Open Courts

ArtVI § 20: All courts shall be open, and every man for an injury done him in his property, person or reputation, shall have remedy by due course of law, and right and justice, administered without denial or delay.
[¶ 83] The open courts provision of the South Dakota Constitution is not offended by this statute. In no way are the courts closed to malpractice plaintiffs: the statute places no unreasonable pre-conditions or obstacles to entry into court. "Open courts" is not a guarantee that all injured persons will receive full compensation or that remedies once existent will always remain so. Kyllo, 535 N.W.2d at 901; cf. Wright, 391 S.E.2d at 570. Nor does this provision assure that a substantive cause of action once recognized in the common law will remain immune from legislative or judicial limitation or elimination. Kyllo, 535 N.W.2d at 901; Wright, 391 S.E.2d at 570. Otherwise, the state of tort law would remain frozen in the nineteenth century, immutable and eventually, obsolete. Reasonable restrictions can be imposed upon available remedies. Kyllo, 535 N.W.2d at 901; Baatz v. Arrow Bar, 426 N.W.2d 298, 304 (S.D.1988). Our function is not to elevate common-law remedies over the Legislature's ability to alter those remedies, but rather, we are to interpret the laws as they affect the "life, liberty, or property of the citizens of the State." Kyllo, 535 N.W.2d at 901. Knowles has not been deprived of any of these rights by the legislative imposition of a damages cap. Our Legislature took reasonable precautions to handle a perceived medical malpractice crisis, thereby preserving health care related services. These precautions are a justifiable basis for the legislative action. Behrns, 229 N.W.2d at 91. Furthermore, to my knowledge only two jurisdictions have interpreted their open courts provisions to flatly preclude damage caps in medical malpractice cases. See Kansas Malpractice Victims Coalition v. Bell, 243 Kan. 333, 757 P.2d 251 (1988)(criticized by Bair v. Peck, 248 Kan. 824, 811 P.2d 1176 (1991)); Lucas v. United States, 757 S.W.2d 687 (Tex.1988).
[¶ 84] Taking guidance from the United States Supreme Court in its interpretation of the federal constitution, we see that the "Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object." Duke Power Co., 438 U.S. at 88 n. 32, 98 S.Ct. at 2638 n. 32, 57 L.Ed.2d at 620 n. 32 (quoting Silver v. Silver, 280 U.S. 117, 122, 50 S.Ct. 57, 58, 74 L.Ed. 221 (1929)). Munn, 94 U.S. at 134, 24 L.Ed. at 87, echoes this point:
A person has no property, no vested interest, in any rule of the common law.... Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances.
Malpractice plaintiffs are entitled to a remedy "by due course of law." That is all the open courts clause guarantees.

LEGAL STATUS OF SDCL 21-3-11
[¶ 85] What, if anything, contained in the 1986 amended version of SDCL 21-3-11 survives this analysis? An unconstitutional provision of a statute may be removed and the constitutional remainder left intact. Simpson, 367 N.W.2d at 768. The "doctrine of separability" requires this Court to uphold the portion of the statute surviving constitutional examination if that portion can stand by itself and if it appears the Legislature would have intended the remainder to take effect without the invalidated section. Id.

*204 `Severance does not depend upon the separation of the good from the bad by paragraphs or sentences in the text of the enactment. The principle of division is not a principle of form. It is a principle of function. The question is in every case whether the Legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded or rejected altogether. The answer must be reached pragmatically, by the exercise of good sense and sound judgment, by considering how the statutory rule will function if the knife is laid to the branch instead of at the roots.'
State ex rel. Strauser v. Jameson, 76 S.D. 490, 493-94, 81 N.W.2d 304, 306 (1957) (quoting Justice Cardozo writing for the New York Court of Appeals in People ex rel. Alpha Portland Cement Co. v. Knapp, 230 N.Y. 48, 129 N.E. 202, 207 (1920) (citation omitted)). As we have an obligation to presume an entire statute is constitutional until established otherwise, we likewise have a corresponding duty to presume that a part of a statute is constitutional until established otherwise.
[¶ 86] As has been noted in this writing, the voluminous 1975-76 legislative history clearly demonstrates the Legislature viewed economic and non-economic damages as two distinct and separate concepts. Further, the cap on non-economic damages can stand by itself as it did from 1976 to 1986. However, for us to permit its standing alone now by statutory construction would leave the surviving portion of the 1986 statute with a cap of $1,000,000 on non-economic damages when prior legislation had capped such damages at $500,000. To uphold a portion of the statute with a doubled amount for a cap would be judicial legislating on our part which is prohibited. 2 Sutherland, Statutory Construction, § 44.15 (5th ed.1993); see also Kapaun v. Fed. Land Bank of Omaha, 64 S.D. 635, 638, 269 N.W. 564, 566 (1936).
[¶ 87] If the 1986 amended form of SDCL 21-3-11 is declared unconstitutional in toto, does the prior version of that statute survive? The effect of an invalid amendment on the prior statute was clearly answered in State v. Reed, 75 S.D. 300, 303, 63 N.W.2d 803, 804 (1954) wherein this Court stated, "[i]f such amendatory act is unconstitutional in its entirety, the law prior to its enactment is still in effect."[27] The basis for this rationale was set forth in State v. Clark, 367 N.W.2d 168, 169 (N.D.1985) which we cited with approval in Weegar v. Bakeberg, 527 N.W.2d 676, 678 (S.D.1995). The Clark Court held:
when legislation that is enacted to repeal, amend or otherwise modify an existing statute, is declared unconstitutional, it is a nullity and cannot affect the existing statute in any manner. Rather, the extant statute remains operative without regard to the unsuccessful and invalid legislation.
[¶ 88] "[N]o law can be changed or repealed by a subsequent act which is void because unconstitutional." Frost v. Corp. Comm'n, 278 U.S. 515, 527, 49 S.Ct. 235, 240, 73 L.Ed. 483, 491 (1929). An act or amendment to an act which violates the Constitution has no power, and can neither build up nor tear down. It can neither create new rights nor destroy existing rights. "It is an empty legislative declaration without force or vitality." Id. Thus, I conclude that as the 1986 amended version of SDCL 21-3-11 is wholly unconstitutional, the pre-amendment 1985 version remains in full force and effect.[28]
[¶ 89] It has been held that whether a prior statute remains operative when the amending statute is held unconstitutional neither depends upon, nor is connected with, legislative intent. Clark, 367 N.W.2d at 170. Nonetheless, in this instance we should not overlook our Legislature's clear intent in enacting the 1976 version of the statute. Its *205 purpose was to limit malpractice awards to make insurance more affordable to the medical profession and consequently make medical care more available to the people. Both statutes sought to accomplish this end, but only the latest version offends our Constitution. Thus by recognizing the constitutional validity of the 1976 version, as amended in 1985, we preserve legislative intent.
[¶ 90] This analysis does not bar the Legislature from addressing the issue in the future. The Legislature has the constitutional authority to place a cap on non-economic and/or economic damages if there is an identified existing or future problem and the solution bears a real and substantial relationship to that problem. However, given the importance of recovery of economic damages to compensate an injured party for past, present and future out-of-pocket expenses and losses, the justification for limiting economic damages will have to be a strong one.
[¶ 91] 2. Are Medical Service Specialists "practitioners of the healing arts" for purposes of SDCL 21-3-11?
[¶ 92] Coverage under SDCL 21-3-11 for "other practitioner(s) of the healing arts" was not added until the 1986 amendment which we now find unconstitutional. Such "practitioners" were not protected by the cap under the 1976, 1978 and 1985 versions of the statute. Thus, the question as to whether a medical service specialist falls within the definition of a practitioner of the healing arts, becomes moot.
[¶ 93] 3. Does South Dakota law recognize emotional distress or loss of consortium for injuries to a minor child as a separate cause of action?
[¶ 94] I concur with the writing of Justice Sabers in its answer to this question.
[¶ 95] 4. Does the statutory limitation on damages apply separately to each of the three plaintiffs in this case and each of the two separate causes of action pleaded?
[¶ 96] I concur with the writing of Justice SABERS in its answer to this question.
[¶ 97] MILLER, C.J., and KONENKAMP, J., concur.
[¶ 98] SABERS and AMUNDSON, JJ., dissent.
NOTES
[1] SDCL 21-3-11 provides:

In any action for damages for personal injury or death alleging malpractice against any physician, chiropractor, dentist, hospital, registered nurse, certified registered nurse anesthetist, licensed practical nurse or other practitioner of the healing arts under the laws of this state, whether taken through the court system or by binding arbitration, the total damages which may be awarded may not exceed the sum of one million dollars.
[2] "Economic damages" is not defined in SDCL. However, "economic loss" under the Crime Victims' Compensation Program is defined as:

[M]edical and hospital expenses, loss of earnings, loss of future earnings, funeral and burial expenses and loss of economic benefits or support to dependents, including home maintenance and child care expenses[.]
SDCL 23A-28B-1. "Noneconomic damages" would be all other damages such as pain and suffering and loss of companionship.
[3] According to Jensen, supra, at 92, "[n]o [medical malpractice damages limit] existed at common law and injured victims received nothing from the legislature in return for the limitation." Therefore, the damages cap violates the right to a remedy or open courts provision. Id.
[4] According to Jensen, supra, at 104:

[T]he United States Supreme Court should and would hold that due process prohibits a legislature from arbitrarily abolishing or limiting common-law rights to redress for injury [open courts].... [A]rbitrary abolition and limitation without a quid pro quo is not [acceptable].
[5] The North Dakota Supreme Court appears to apply a less rigid test for due process than South Dakota. Arneson, 270 N.W.2d at 137. For due process, North Dakota determines whether the statute is "arbitrary and unreasonable" and that the methods have a "reasonable relation to the attainment of the results desired." Id. at 137. We require a "substantial relation[.]" Katz, 432 N.W.2d at 278 n6.
[6] SDCL 21-3-11 was adopted as a result of recommendations by the 1975 South Dakota Legislature's Special Committee on Medical Malpractice. As noted by one commentator:

Statements made by insurance representatives before the [Committee], referring to the low number of medical malpractice claims brought in the state, can only create significant doubt that South Dakota was experiencing a genuine insurance crisis at that time. Startling data on medical malpractice claims in South Dakota, North Dakota, and Minnesota, collected by the Minnesota Department of Commerce from 1982-1987 [the Hatch Study], also tends to call into question the basis for cries of any insurance crisis; if claim frequency and severity did not change significantly in those years, and if in those same six years only one-half of one percent of all medical malpractice plaintiffs were awarded any damages, why then did physicians' insurance premiums triple in that same time period?
Eiesland, infra, at 703 (emphasis in original).
The Hatch Study concluded that "[d]espite unchanging claim frequency and declining loss payments and loss expense, on average, physicians paid approximately triple the amount of premiums for malpractice insurance in 1987 than in 1982." Hatch Study, at 31. During that time period, there were three files where a company paid $1 million or more, and 15 files where a company paid equal to or greater than $500,000. Hatch Study, at 15-16. The Hatch Study was a study of the two major medical malpractice insurers for Minnesota, North Dakota, and South Dakota during 1982-1987.
Evidence presented to the 1975 Committee indicated that only two jury verdicts in the last few years had been obtained against doctors in South Dakota. One verdict was for $1 and the other was for $10,000.
In Arneson, 270 N.W.2d at 136, the North Dakota Supreme Court upheld the trial court's finding that no medical malpractice insurance availability or cost crisis existed:
The Legislature was advised that malpractice insurance rates were determined on a national basis, and did not take into account the state-wide experience of smaller States such as North Dakota. Thus, premiums were unjustifiably high for States such as North Dakota with fewer claims and smaller settlements and judgments.
Id. Similar evidence on how rates are calculated was presented to the 1975 South Dakota Committee.
In addition, a 1986 report by the National Association of Attorneys General concluded that "insurance premium increases were not related to any purported liability crisis, but `result[ed] largely from the insurance industry's own mismanagement.'" Eiesland, supra, at 685 n. 121 (quoting W. John Thomas, The Medical Malpractice "Crisis": A Critical Examination of a Public Debate, 65 Temp. L.Rev. 459, 473 (1992) (quoting National Association of Attorneys General, An Analysis of the Causes of the Current Crisis of Unavailability and Unaffordability of Liability Insurance (1986))).
[7] Before the amendment in 1986, SDCL 21-3-11 provided in part:

In any action for damages for personal injury or death alleging malpractice against any physician, chiropractor, dentist, hospital, sanitorium, registered nurse, or licensed practical nurse under the laws of this state, whether taken through the court system or by binding arbitration, the total general damages which may be awarded may not exceed the sum of five hundred thousand dollars. There is no limitation on the amount of special damages which may be awarded....
1985 SDSessLaws ch 167 (emphasis added).
[8] In Boucher v. Sayeed, 459 A.2d 87, 93 (R.I.1983), the court used the rational basis test to invalidate a medical malpractice recovery cap. The damages cap failed to satisfy the rational basis test because the perceived "crisis" it was meant to address no longer existed, if it did at all. Id.; see also Arneson, 270 N.W.2d at 136 (damages cap violated equal protection under North Dakota's constitution).
[9] Katz, 432 N.W.2d at 278 n6.
[10] Like the following jurisdictions, our Legislature rationally concluded a damages cap would work to reduce the aggregate amount of damage awards for medical malpractice and thereby help to reduce malpractice insurance rates and health care costs. See Davis v. Omitowoju, 883 F.2d 1155, 1158-59, n.5 (3rd Cir.1989); Boyd v. Bulala, 877 F.2d 1191, 1197 (4th Cir.1989); Woods v. Holy Cross Hospital, 591 F.2d 1164, 1173 (5th Cir.1979); Hoffman v. United States, 767 F.2d 1431, 1437 (9th Cir.1985); Fein v. Permanente Medical Group, 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665, 680 (1985); Scholz v. Metropolitan Pathologists, PC., 851 P.2d 901, 907 (Colo.1993); Johnson v. St. Vincent Hospital, Inc., 273 Ind. 374, 404 N.E.2d 585, 597 (1980); Adams v. Children's Mercy Hospital, 832 S.W.2d 898, 904 (Mo.1992); Prendergast v. Nelson, 199 Neb. 97, 256 N.W.2d 657, 668 (1977); Robinson v. Charleston Area Medical Center, Inc., 186 W.Va. 720, 414 S.E.2d 877, 887 (W.Va.1991); State ex rel. Strykowski v. Wilkie, 81 Wis.2d 491, 261 N.W.2d 434, 442 (1978). "Were this to result, the legislature could reason, physicians would be willing to continue `high risk' medical practices ... and provide quality medical services at a less expensive level than would otherwise be the case." Adams, 832 S.W.2d at 904.
[11] Some version of damage caps have been upheld in California, Colorado, Idaho, Indiana, Louisiana, Maryland, Massachusetts, Missouri, Nebraska, South Carolina, Virginia, Virgin Islands, West Virginia and Wisconsin. Damage cap statutes have been stricken in Alabama, Illinois, Ohio, New Hampshire, North Dakota, Montana, Texas, Utah, and Washington. Florida and Kansas have held both ways, depending on the nature of the statute. Federal courts have uniformly upheld damage caps under the United States Constitution.
[12] See Carol A. Crocca, Validity, Construction and Application of State Statutory Provisions Limiting Amount of Recovery in Medical Malpractice Claims, 26 ALR5th 245 (1995).
[13] The South Dakota State Senate passed a resolution that set up a special committee to study the costs and availability of medical malpractice insurance.
[14] The South Dakota Legislature heard testimony from doctors, attorneys, insurance company representatives and other interested parties regarding the medical malpractice crisis. A summary of some of the testimony given by the medical community follows:

(1) Dr. Odland (Aberdeen)Availability of adequate medical malpractice insurance is minimal and the cost of such coverage is becoming more expensive. The situation has arisen because of the increase in the number of malpractice claims and total amounts of paid judgments.
(2) Robert Johnson (South Dakota Medical Ass'nSioux Falls) Insurance companies stopped writing malpractice coverage for solo doctors who want to go into practice. Therefore, irrespective of cost, a doctor may not be able to obtain insurance if he does not join a group already covered. In South Dakota this presents a major problem because in many communities solo doctors are very much in demand.
(3) Dr. Ryan (Mobridge)Reflecting on rate increases, it will cost $3-5 more per patient for each visit. In South Dakota, approximately 480 private practitioners, because of the high cost of malpractice coverage, will be forced to restrict their practice. This will mean, especially in small communities, doctors may need to refer patients to a doctor in a large city.
(4) Dr. Harris (Rapid City)Malpractice insurance premiums since 1968 have increased 800%.
(5) Dr. Sieton (Gettysburg)He has been trying to get another doctor to practice medicine in his area but due to the present malpractice insurance situation, it is becoming very difficult to interest any physician to come to rural SD.
[15] Jack E. Mobley, M.D., Assoc. Dean for Clinical Sciences at the University of South Dakota Medical School, in a letter dated October 3, 1975, to the Special Legislative Committee, predicted the direct availability of physician-to-patient would diminish as the cost and risks of practice continued to escalate. He further indicated it was very difficult for a practitioner coming into this state to obtain insurance, thus restricting the attraction of physicians into family practice in South Dakota.
[16] See Gail D. Eiesland, Miller v. Gilmore: The Constitutionality of South Dakota's Medical Malpractice Statute of Limitations, 38 SDLRev 672 (1993).
[17] Frank Drew, the President of the South Dakota Hospital Association filed an affidavit in which he claimed the 1976 version of SDCL 21-3-11 to be a success. Mr. Drew stated that in 1986 seventeen hospitals in South Dakota were dropped by their insurer. The seventeen hospitals had no difficulty in obtaining replacement insurance in a short period of time. Mr. Drew reasons that this "company would not have come into South Dakota had it not been for the malpractice reforms, including SDCL 21-3-11, which had been adopted by the legislature of this state commencing in 1976."
[18] Our first statutory law concerning negligence, codified at what is now SDCL 20-9-1, was enacted in 1877. It provides "[e]very person is responsible for injury to the person, property, or rights of another caused by his willful acts or caused by his want of ordinary care or skill...." That 1877 Territorial Legislature also enacted what is now SDCL 21-1-1: "[e]very person who suffers detriment from the unlawful act or omission of another may recover from the person in fault a compensation therefor in money, which is called damages. Detriment is a loss or harm suffered in person or property." A third statute passed that year, now SDCL 21-3-1, provides that the measure of damages: "is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

Clearly at this point, the Territorial Legislature could substantially alter or modify these statutes as only one year before, the United States Supreme Court had held "a person has no property, no vested interest, in any rule of the common law." Munn v. Illinois, 94 U.S. 113, 134, 24 L.Ed. 77, 87 (1876). This continues to be the existing rule of law to this day. Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 88 n. 32, 98 S.Ct. 2620, 2638 n. 32, 57 L.Ed.2d 595, 620 n. 32 (1978). To hold otherwise would lock the common law into its 1889 mold and not allow it to grow and change with the times and the needs of society. Daugaard v. Baltic Coop. Bldg. Supply Ass'n, 349 N.W.2d 419, 425 (S.D.1984).
In 1889 our State adopted a Constitution as part of its admission into the Union. The effect of this Constitution was discussed in Oien v. City of Sioux Falls, 393 N.W.2d 286, 290 (S.D.1986):
The Constitution of South Dakota is not a grant but a limitation upon the lawmaking powers of the state legislature and it may enact any law not expressly or inferentially prohibited by the state or federal constitution.... [I]n order to determine that an act is unconstitutional we must find some provision that prohibits the enactment of a statute rather than for grants of such power. (citations omitted)
In our seminal negligence case, Sanders v. Reister, 1 Dak. 151, 46 N.W. 680, 681 (1875), the Supreme Court of Dakota Territory affirmed a verdict which allowed damages for "pain and suffering, bodily and mental." In our first medical malpractice case, Baxter v. Campbell, 17 S.D. 475, 476, 97 N.W. 386, 386 (S.D.1903), recovery was sought for improperly setting a broken leg as "plaintiff has suffered extreme pain, both of body and mind[.]" The Court in Davis v. Holy Terror Mining Co., 20 S.D. 399, 412, 107 N.W. 374, 378 (1906) defined the scope of recoverable damages as follows:
In making the estimate the jury should take into consideration the age and condition in life of the plaintiff, the physical injury inflicted, the bodily pain and mental anguish endured, all expenses incurred in the treatment of the case, and any and all damages which it may appear from the evidence have resulted or will result from the injury. Whether the injury is temporary or permanent and whether a capacity to earn money has been reduced by the accident, may also be taken into account. (emphasis added).
This general rule of damages continues to this day. See Kyllo v. Panzer, 535 N.W.2d 896, 899 (S.D.1995) and cases cited therein.
[19] The writing of Justice Sabers relies on Arneson v. Olson, 270 N.W.2d 125 (N.D.1978) which held North Dakota's malpractice cap violated substantive due process. Not only was the damages cap statute in Arneson materially different from ours, the trial court also found "there did not appear to be an availability or cost crisis" in North Dakota. Arneson, 270 N.W.2d at 136. South Dakota's experience was quite different. We had the seventh worst loss-to-premium ratio in the nation and insurance companies were raising their rates accordingly or withdrawing coverage altogether. Testimony before the special legislative committee established that rising premiums were having a direct affect on the availability of health care. The cap is also different from the classification rejected by this Court in Lyons v. Lederle Laboratories, 440 N.W.2d 769, 771 (S.D.1989). There the Legislature implemented tight restrictions on the statute of limitations depending upon the age of the minor filing a medical malpractice action. Id. All other tort claims by a minor, however, survived until age nineteen. Id. Here, no such invidious classification exists and every person under similar circumstances is governed by the same remedy.
[20] The history of due process analysis in this State dates back nearly to the adoption of our Constitution in 1889. In the first construction of our due process clause, the Court reasoned: "[w]hat the legislature ordains and the constitution does not prohibit must be lawful." State v. Scougal, 3 S.D. 55, 72, 51 N.W. 858, 864 (1892) (citing Cooley on Torts, p 277). In Scougal, the Court engaged in a simultaneous examination of the statute in question under both equal protection and due process analysis using a reasonableness standard. Our current standard traces its adoption to Ex parte Hawley, 22 S.D. 23, 29, 115 N.W. 93, 95 (S.D.1908) (citing Mugler v. Kansas, 123 U.S. 623, 661, 8 S.Ct. 273, 297, 31 L.Ed. 205, 210 (1887)). It reappears in State v. Nuss, 79 S.D. 522, 528, 114 N.W.2d 633, 636 (1962). It has remained the standard thereafter. Crowley v. State, 268 N.W.2d 616, 619 (S.D.1978); State v. Hy Vee Food Stores, 533 N.W.2d 147, 148 (S.D.1995).
[21] Plaintiff argues that SDCL 21-3-11 violates the due process clause as it took away rights from him and gave him nothing back in return, in other words, no quid pro quo. His argument fails for several reasons. Initially, this doctrine has not been recognized as a right under the United States Constitution. Jones v. State Bd. of Medicine, 97 Idaho 859, 555 P.2d 399, 408-09 (1976). Neither has it ever been recognized under the South Dakota Constitution. Our due process standard of review is well established. Second, it has been shown above that there is no property right to be violated in the limiting of a rule of the common law. Duke Power, 438 U.S. at 88 n. 32, 98 S.Ct. at 2638 n. 32, 57 L.Ed.2d at 620 n. 32.

Finally, even if we accept Plaintiff's premise, the Legislature did provide quid pro quo. SDCL 21-3-11's stated purpose when enacted in 1976 was to provide continuing medical services to this State. The objective of the act was to benefit all citizens of this State and not just the Plaintiff. However, Plaintiff will be in need of these services the rest of his life. Hopefully he can live or travel anywhere in this State and have access to appropriate medical care.
This act was also passed to solve what was perceived as an insurance crisis. Obtaining a multi-million dollar judgment does a plaintiff little good if it is not collectable. From an injured party's perspective, which is better, a paid-in-full million dollar judgment or a five million dollar judgment which is uncollectible or discharged in bankruptcy? While Plaintiff has the good fortune in this case of having the deep pocket of the United States as Defendant, many doctors and smaller hospitals in this State do not have such a deep pocket and insurance is the only guarantee of compensation to an injured patient. No one would benefit if we would return to the problems of 1975-76 where two hospitals in South Dakota were operating without any malpractice insurance due to its high cost and lack of availability.
[22] No exactness of calculation can be established for non-economic damages which we call upon a jury to quantify into a dollar award. Trial and appellate courts can review jury awards for economic damages in light of the evidence such as has been provided here (see footnote 14) and determine whether an award is justified or in excess of the plaintiff's loss. No such similar assurance can be provided for intangible non-economic losses which, from the standpoint of the insurer and the insured medical provider, pose the real threat of risk of run-away verdicts. No better example of this problem is needed than the case now before us. While Plaintiff has readily provided its estimate of economic losses, supported by unrefuted expert testimony, Plaintiff has yet to produce a claim for a specific dollar amount for non-economic damages, let alone any evidence in support of a specific dollar award.
[23] Sadly, one need not theorize on this point but merely has to review the testimony presented in the case now before us. Plaintiff's expert, Dr. Ralph Brown, testified at deposition the cost of care for Kris Knowles' shortened lifespan of 35-40 years would be in excess of $2,000,000. Dr. Brown further testified lost wages for this length of lifespan was between $800,000 and $1,200,000 depending on education. While Defendant disputes these figures, it readily offered to pay $1,000,000 after discovery prior to any trial on the merits.
[24] The only other amendment to the statute occurred in 1978 when chiropractors were included. The cap on non-economic damages was retained as originally enacted. The Legislature continued to believe the original ten-year limit on the statute was appropriate as it made specific provision to apply that limit to the newly-covered chiropractors as well. 1978 SD SessLch 154.
[25] 25. This new cap was apparently contrived without any of the deliberation the 1976 enactment underwent. In fact, by all indications, the 1976 cap had been accomplishing its purpose. See footnote 8.
[26] The writing of Justice Sabers states that no medical malpractice damages limit existed at common law. This should not be interpreted, however, to mean that injured parties prior to 1976 received full compensation as determined by a jury which they are now denied by SDCL 21-3-11.

Capping malpractice awards was probably not considered a need as only one medical malpractice case can be located in this jurisdiction from 1877 to 1920, that being Baxter in 1904 in which the defendant doctor prevailed.
While there have not been caps of medical malpractice cases per se, they, along with all other torts, have been subject to all sorts of restrictions under the common law and statutes. But for the Federal Tort Claims Act, the plaintiffs herein would not have had a cause of action as it would have been barred by sovereign immunity of the United States. Knowles, 829 F.Supp. at 1151. While the Legislature has now seen fit to limit the amount of jury awards, this is nothing new to the judiciary via motions for new trial or a remittitur. (see § 286(5) of the 1883 Revised Codes of the Territory of Dakota "excessive damages.") Historically, appellate courts have not been adverse to cut a jury verdict in medical malpractice cases in lieu of granting a new trial to the defendant doctor. See Reynolds v. Smith, 148 Iowa 264, 127 N.W. 192 (1910) (verdict cut 40%) and Evans v. Roberts, 172 Iowa 653, 154 N.W. 923 (1915) (verdict cut 32%).
Finally, the Legislature has consistently seen fit to exempt certain property from legal process to satisfy a judgment, e.g. 1877 Dakota Territory Political Code Ch 38 § 1 (now SDCL 43-31-1) and §§ 322, 323, 324 and 325 (now SDCL 43-45-1 though 6.)
[27] See also Norton v. Shelby County, 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178 (1886); Westinghouse Credit Corp. v. J. Reiter Sales, Inc., 443 N.W.2d 837, 839 n1 (MinnApp 1989); Kwik Shop, Inc. v. City of Lincoln, 243 Neb. 178, 498 N.W.2d 102, 109 (1993); Town of Beloit v. City of Beloit, 37 Wis.2d 637, 155 N.W.2d 633, 638 (1968); 1A Sutherland, Statutory Construction, § 22.37 (5th ed 1993); and 82 CJS Statutes §§ 270, 281 (1953 & Supp 1995) and cases cited therein.
[28] While this appears to be the rule followed in civil cases, the argument has been advanced that it should not automatically be applied in criminal cases. See B.H. v. State, 645 So.2d 987, 997 (Fla.1994) (Kogan, J., concurring in part, dissenting in part), cert. denied ___ U.S. ___, 115 SCt 2559, 132 L.Ed.2d 812 (1995). Therefore, at this time I would apply this rule only to civil cases and leave the question of whether it should be applied in criminal cases to another day.